**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Patrick G. HENRY, Defendant-Appellant.**

No. 79–1121.

United States Court of Appeals,
Ninth Circuit.

Feb. 22, 1980.

Rehearing Denied April 14, 1980.

1224

Ronald W. Sommer, Tucson, Ariz. (argued), for defendant-appellant; Harold I. Glaser, Baltimore, Md., on brief.

Dale Danneman, Tucson, Ariz. (argued), for plaintiff-appellee; Michael D. Hawkins, U. S. Atty., Tucson, Ariz., on brief.

Before DUNIWAY, PECK *, and HUG, Circuit Judges.

HUG, Circuit Judge:

The appellant, Patrick G. Henry, was convicted for knowingly delivering a briefcase in which there was a firearm to a common carrier (American Airlines) for shipment in interstate commerce without giving written notice, in violation of 18 U.S.C. §§ 922(e) and 924(a). The case principally involves the validity of an airport search of a passenger's briefcase, the specific application of the federal statute regulating the interstate transportation of firearms, and the pretrial delay in prosecution of the appellant.

The contentions the appellant urges on appeal are: (1) that the search of his briefcase was unlawful, (2) that his arrest was illegal, (3) that his Sixth Amendment speedy trial rights were violated, and (4) that he comes within an exception to the criminal statute he was charged with violating. Having carefully considered these contentions, we find no error which requires a reversal, and we therefore affirm the conviction.

*Facts*

I. *Facts Surrounding Search and Arrest.*

On December 6, 1977, at approximately 11:30 A.M., Henry, using the name Donald Vester, approached ticket agent Eugene Zarr at the American Airlines counter at the Tucson International Airport. Henry held a ticket for a night flight from Tucson to Dallas. He requested Zarr to upgrade the ticket so he could take a day flight to Dallas, leaving at 11:55 A.M. that morning. The only baggage Henry had with him was a briefcase, which he gave to the agent to be checked onto the plane.

After the agent had attached the baggage check to the briefcase, Henry asked for the briefcase back, saying that he need-ed something from it. Zarr returned the briefcase, and Henry took it with him to the men's room.

This act, coupled with the facts that Henry was wearing an ill-fitting wig and a "couple of sets of clothes," and that he appeared to be very nervous, aroused Zarr's suspicions. While Henry was gone with the briefcase, Zarr reported these events and his observations to his supervisor, Eugene Weber. Weber, who was concerned that the briefcase might contain an explosive device, told Zarr that when Henry returned with the briefcase Zarr should tell Henry that the airline had closed the luggage acceptance for that flight at the ticket counter, and that Henry should take the bag to the gate, where it could then be loaded onto the plane as checked baggage.[1] The purpose of telling this to Henry was so that the briefcase would pass through the x-ray scanner as Henry proceeded to the gate.

When Henry returned, and again presented the briefcase for check-in, Zarr told him this story. Henry protested that he wished to have the bag checked and did not want to carry it on board the plane. Zarr repeated that he would have to have it checked at the gate. Henry then took the briefcase and went to the security checkpoint. The security agent ran the briefcase through the scanner twice. She saw some dark objects but could not determine what was in the briefcase, so she asked the defendant to open it. Henry told her the briefcase contained "tools and stuff," and that he did not have the key to open it. The police officer at the check-point came over at this point and told Henry that if he would not open the briefcase, Henry would have to take it back to the ticket counter and check it through as baggage. Henry returned with the briefcase to the ticket counter and informed Zarr of what had occurred at the check-point. Henry also told Zarr that he did not have the key to open the briefcase. Zarr then took the

---

* The Honorable John W. Peck, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

1. About ten minutes before flight time, the ticket counter no longer accepts baggage to be checked on the flight. In fact, the ticket counter had not yet stopped accepting baggage for the flight to Dallas.

briefcase and told Henry that he would get his supervisor (Weber), and that Henry should meet them at the check-point.

When Zarr and Weber arrived at the check-point Henry had already gone to the gate area where the flight for Dallas was boarding. Zarr and Weber left the briefcase at the check-point and went to the gate to talk with Henry.

Weber told Henry that unless he was willing to open the briefcase he could not take it to Dallas with him. Henry insisted that he wanted the briefcase checked, and Weber again told him the briefcase could not be transported unless it was opened for inspection. When Henry stated he did not have the key to open it, Weber told Henry he did not believe him. Weber informed Henry that Weber could open the bag either by using a key American Airlines had or by forcing it open, and that he would do so with a policeman present to ensure that nothing was stolen from the briefcase. At this point Henry said, "I've got to have that bag in Dallas. Okay." Henry then turned away and boarded the plane.

Zarr returned to the ticket counter while Weber went to inform George Boiko, the manager of airport services for American Airlines in Tucson, of what had taken place. Boiko went with Weber back to the check-point, where the briefcase still remained, unopened. Boiko and Weber each looked at the screen while the briefcase was passed through the scanner. The security agent also took another look. The only object they could identify was a pair of pliers, although the security agent said she thought there might be a gun inside.

Boiko and Weber and one of the airport security policemen took the briefcase down to the American Airlines' baggage service office to open the briefcase and determine its contents. They were able to open one latch of the briefcase with a key, but were unable to open the other latch. After prying up the unlocked end, they saw what appeared to be a string. Fearing that it might be a fuse or part of an explosive

device, they discontinued their efforts to open the briefcase.

The briefcase was placed outside in a bomb bucket [2] by the Tucson Airport Authority police. The Pima County Sheriff Department bomb squad was then notified. Two men from the bomb squad arrived and first checked the briefcase for sound by using an electronic stethoscope. No noise from a mechanism was detected. This was done while awaiting the arrival of two dogs trained to detect explosives. The two dogs were led near the bomb bucket, and they reacted in such a manner as to indicate that there was something of an explosive nature in the briefcase. When the briefcase was finally opened, a metal box was found inside which contained a loaded revolver. The dogs were trained to respond to the type of powder contained in the cartridges of the bullets. A hunting knife, some tools, and some firecrackers were also found inside the briefcase.

After this discovery the FBI was notified. On his way to the airport, Agent Donn Sickles contacted Assistant United States Attorney Daniel Knauss, and relayed the information he had received from the airport authorities. Sickles received more information after arriving at the airport, and he again called Knauss. The information Sickles received was that Henry had attempted to board the aircraft with a weapon. This was erroneous, because Henry was attempting to check the briefcase as baggage. At this time Knauss authorized the arrest of Henry.

Sickles telephoned all of this information to Dallas. Frank Ramirez, a police officer, told FBI Agent Steve Rand, who was stationed at the Dallas-Fort Worth Airport, the facts Sickles had communicated to Dallas. Rand located Henry arriving at the airport and immediately took him to an interview room. Rand called Sickles to obtain more details. He was advised that the defendant had attempted to board the plane with a briefcase in which a gun and some

---

2. A bomb bucket is a fiberglass bucket constructed so that if anything in it explodes the

fragments will shoot straight up rather than sending shrapnel in all directions.

burglary tools were found, and that the United States Attorney's Office in Tucson had authorized an arrest. Rand called the United States Attorney's Office in Dallas to obtain another prosecutor's opinion. That office also authorized an arrest. Henry was then formally arrested and taken to county jail in Forth Worth.

It was not until later that any of the federal officials involved learned that Henry had attempted to check the briefcase and had proceeded to the check-point only because he had been told by American Airlines personnel to do so to check the bag.

## II. Facts Relating to Speedy Trial Claim.

On December 7, 1977, Henry was charged by complaint, in the United States District Court for the District of Arizona, with violating 18 U.S.C. § 922(e). This complaint was dismissed at the request of the Government on December 19, 1977.

Henry was indicted in the Superior Court of Arizona in and for Pima County for attempted murder on March 9, 1978. The State of Arizona, through its Governor, commenced extradition proceedings against Henry on March 17, 1978, and notified the Governor of Maryland[3]. On August 16, 1978, while Henry was challenging the extradition in the Maryland state courts, he was indicted by a federal grand jury in Arizona for the violation of section 922(e) and the penalty provision, section 924(a). Henry was arrested, as a result of this indictment, on a warrant of removal in the District of Maryland. After an appearance before a magistrate, Henry was released on an unsecured bond of $25,000. On October 26, 1978, he appeared in the United States District Court for the District of Arizona for the purpose of arraignment. Upon completion of the arraignment, as he was leaving the courtroom, Henry was arrested by Pima County authorities pursuant to the pending state charges.

## III. Proceedings Below.

Henry pleaded not guilty to the federal charges. He filed a motion to suppress on the ground that the search of his briefcase violated his Fourth Amendment rights, and a motion to dismiss on the ground that his constitutional right to a speedy trial had been violated. On December 4, 1978, an evidentiary hearing was held on the motion to suppress, and argument was heard on the motion to dismiss. The motion to suppress was denied on findings of probable cause, consent, and abandonment. The motion to dismiss was denied on findings that no prejudice to the defendant had resulted, nor was there any bad faith on the part of the Government. On December 14, 1978, Henry was tried without a jury on the stipulated facts from the evidentiary hearing. The defendant was found guilty and sentenced to 15 months imprisonment.

### Discussion

## I. The Searches

We consider the applicability of the Fourth Amendment first to the initial x-ray scan, when Henry himself brought the briefcase to the check-point, and then to the x-ray scan with the subsequent opening of the briefcase, after Henry had boarded the plane.

## A. The First X–Ray Scan

■ The x-ray scan, as the Government concedes, is clearly a search. It is true that it is less intrusive than a physical search, but it nonetheless reveals, to a certain extent, articles the owner has chosen to conceal from view. It is certainly a more intrusive device than the magnetometer, the use of which has been held to constitute a search. *See United States v. Epperson*, 454 F.2d 769 (4th Cir.), *cert. denied*, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972). In fact, the express purpose of the x-ray scan is to search for guns and explosive devices.

---

**3.** Henry had returned to his home in Maryland after being released on a $10,000 unsecured

appearance bond following the filing of the first complaint.

■ Having determined that the use of the x-ray scan on Henry's briefcase was a search, our holding in *United States v. Davis*, 482 F.2d 893 (9th Cir. 1973), requires that the search be subject to the requirements of the Fourth Amendment. In *Davis* we held that because of the significant participation of the government in the development and implementation of the airport search program, "any search conducted pursuant to that program [is] within the reach of the Fourth Amendment." *Id.* at 904. The x-ray scan system is used as part of the screening system required by 14 C.F.R. § 121.538(b) (1979).[4] This is precisely the kind of government involvement we held in *Davis* to be sufficient to invoke the protection of the Fourth Amendment.[5]

In *Davis*, this court stated the standard for the validity of an airport search under the Fourth Amendment:

[A]irport screening searches of the persons and immediate possessions of potential passengers for weapons and explosives are reasonable under the Fourth Amendment provided each prospective boarder retains the right to leave rather than submit to the search.

482 F.2d at 912. We have interpreted *Davis* to require that the search be reasonable and that there be "implied consent" by the person to be searched. *McMorris v. Alioto*, 567 F.2d 897, 900 (9th Cir. 1978). The x-ray scan as used in the present case was a reasonable procedure. It was a non-discriminatory search, used on every object carried by every person who wished to approach the boarding gates. The scan is used only to detect guns or explosives, not as a device to detect all types of contra-

band. In the majority of cases no physical search is required. A physical search is requested only if the scan detects the possible presence of a gun or an explosive. This technique allows most passengers to avoid the more intrusive physical search that we held to be reasonable in *Davis*. The x-ray scan reflects an improvement in technology during recent years which helps insure that the screening process is no more extensive nor intensive than necessary. In discussing the burden search procedures place upon the exercise of the constitutional right to travel, we stated:

[A] screening of passengers and of the articles that will be accessible to them in flight does not exceed constitutional limitations provided that the screening process is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives, that it is confined in good faith to that purpose, and that potential passengers may avoid the search by electing not to fly.

*Davis*, 482 F.2d at 913 (footnote omitted).

We also hold that Henry impliedly consented to the scan. We presaged this holding by our statement in *Davis* that:

It may well be that under the present airport screening program, operating pursuant to current regulations, the alternatives presented to a potential passenger approaching the screening area are so self-evident that his election to attempt to board necessarily manifests acquiescence in the initiation of the screening process.

*Id.* at 914. With the passage of seven years since the *Davis* case we recognize that the

---

4. 14 C.F.R. § 121.538(b) provides:

(b) Each certificate holder shall adopt and put into use a screening system, acceptable to the Administrator, that is designed to prevent or deter the carriage aboard its aircraft of any explosive or incendiary device or weapon in carry-on baggage or on or about the persons of passengers, except as provided in § 121.585, and the carriage of any explosive or incendiary device in checked baggage. Each certificate holder shall adopt and put into use its security program prescribed in paragraph (c) of this section.

5. As the government conceded at oral argument, our holding in *United States v. Gumerlock*, 590 F.2d 794 (9th Cir.), *cert. denied*, 441 U.S. 948, 99 S.Ct. 2173, 60 L.Ed.2d 1052 (1979), is not applicable to the case before us. In *Gumerlock* there was no involvement by government agents in the search, and we held that the private search was not conducted pursuant to the requirements of any federal regulation. In the instant case there is, however, no question that the x-ray scan is part of the federally mandated program.

public has become increasingly aware of the security measures used in airports. Signs were posted both at the ticket counter and the check-point clearly informing passengers that they could refuse to submit to any inspection.[6]

Henry was not ordered or compelled to produce the briefcase for the initial scan. He was initially told that the ticket counter was not receiving any more baggage for the flight to Dallas, and that if he wanted to check the briefcase he would have to take it to the gate. The briefcase was not taken from him and he was free to take the briefcase and leave the airport altogether or to board without taking or checking the briefcase, rather than submit it to the x-ray scan. *Cf. McMorris v. Alioto*, 567 F.2d at 901 (implied consent to limited regulatory search).

Under these circumstances we hold that the first x-ray scan of Henry's briefcase did not violate Henry's rights under the Fourth Amendment.[7] *See United States v. Davis*, *supra*. *Accord, United States v. Skipwith*, 482 F.2d 1272, 1276–77 (5th Cir. 1973); *United States v. Doran*, 482 F.2d 929, 931 (9th Cir. 1973); *United States v. Bell*, 464 F.2d 667, 672–74 (2d Cir.), *cert. denied*, 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972). We note that the initial use of the x-ray scan produced no evidence, although perhaps it led to the later discovery of evidence. The x-ray is used only to determine whether a further physical search is indi-cated. *Cf. United States v. Doran*, 482 F.2d at 932 (magnetometer used only to indicate whether physical search is necessary). Henry originally refused to submit to the physical search and was sent back to the ticket counter. The gun was not discovered until the briefcase was later opened.

**B.** *The Second Scan and Physical Search*

The second scan of the briefcase was conducted at the check-point by the airline officials and the private security guard. This search was not conducted as part of the program of screening passengers attempting to board. Henry had already boarded, and he would not have had access to the briefcase during the flight, because the airline employees intended to ship the suitcase on the next flight to Dallas. Their suspicions had been aroused by Henry's behavior and by the earlier scan, and they intended to ensure that there were no explosives in the briefcase.

In view of the substantial government involvement when the gun was actually discovered, we do not reach the question whether the airline employees were acting pursuant to government regulations[8] or whether their use of the x-ray scanner involved the government in the search to such an extent as to necessitate the application of the Fourth Amendment. An airport policeman accompanied Weber and Boiko to the baggage service office, where they opened one end of the case far enough to

6. The signs read:
 *IT IS A CRIME to carry a concealed weapon aboard aircraft
 *Federal Safety rules require inspection of persons and hand carried articles passing an inspection point
 *Inspection may be refused
 *Persons refusing inspection will not be permitted to pass the inspection point

7. We express no opinion as to whether submission to the x-ray scan constitutes consent to physical inspection, if requested.
 *See United States v. DeAngelo*, 584 F.2d 46, 47–48 (4th Cir. 1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979).

8. The federal regulations have been amended since our holding in *Davis*. Each carrier is now required to adopt a screening system to deter the carriage of "any explosive or incendiary device in checked baggage," 14 C.F.R. § 121.-538(b). See note 4, *supra*. Formerly the regulation applied only to carry-on baggage. There is no evidence presented as to whether American Airlines has adopted such a system, which would constitute government involvement in the employee's actions. In the context of a search of *air freight, in United States v. Gumerlock*, 590 F.2d at 799, absent evidence of the adoption of a system pursuant to government regulations we found the search to be a private search. In *Gumerlock*, there was no other government participation in the search, which was carried out solely by the airline employees. Because there is government involvement in the search in the present case, we need make no inquiry as to whether American Airlines has adopted such a system.

see a string. At this point they ceased their efforts. The briefcase was carried outside by airport policemen and placed in the bomb bucket. The Pima County Sheriff's Department was notified, and a bomb squad was dispatched. The physical search of the briefcase was performed by the Deputy Sheriffs. The gun was discovered in the course of this search. Because the search was conducted by the state police, the Fourth Amendment protections apply by virtue of the Fourteenth Amendment.

 The search was conducted without a warrant. Normally, searches of private property must be performed pursuant to a search warrant issued in compliance with the warrant clause of the Fourth Amendment. *Arkansas v. Sanders,* 442 U.S. 753, 758, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235, 241 (1979) (and cases cited). A search conducted without a warrant is *"per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). One of these specific exceptions to the warrant and probable cause requirements of the Fourth Amendment is that a search conducted pursuant to a valid consent is constitutionally permissible. *Schneckloth v. Bustamonte,* 412 U.S. at 219, 93 S.Ct. at 2043.

██ Where consent is relied upon to justify the lawfulness of a search, the government "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Id.* at 222, 93 S.Ct. at 2045 (quoting *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968)). "The issue of whether or not consent to search was freely and voluntarily given is one of fact to be determined on the basis of the totality of the circumstances." *United States v. Sierra-Hernandez,* 581 F.2d

760, 764 (9th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978) (citing *Schneckloth v. Bustamonte* ). We will not overturn the finding of the trial judge in this regard unless it is clearly erroneous. *Id.* The trial judge in the present case found that Henry had consented to the search of the briefcase by saying "I've got to have that bag in Dallas. Okay," after Weber repeatedly told the defendant the bag would not be shipped to Dallas unless it was first opened in order to determine the contents.

██ We agree that, under the totality of the circumstances, Henry freely and voluntarily consented to the search of the briefcase.[9] Upon review of a denial of a motion to suppress after conviction, we view the evidence in the light most favorable to the government. *United States v. Phelps,* 490 F.2d 644, 645 (9th Cir.), *cert. denied,* 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974); *United States v. Rothman,* 492 F.2d 1260, 1262–63 (9th Cir. 1973).

In determining whether Henry freely and voluntarily consented to the search we believe the crucial factor is whether Henry could have freely withdrawn the briefcase and avoided the search. *See United States v. Davis,* 482 F.2d at 910–11; *United States v. Miner,* 484 F.2d 1075, 1076–77 (9th Cir. 1973); *United States v. Freeland,* 562 F.2d 383, 386 (6th Cir.), *cert. denied,* 434 U.S 957, 98 S.Ct. 484, 54 L.Ed.2d 315 (1977). There is ample evidence to support this finding. When Henry first asked for the briefcase for a few minutes at the ticket counter, the agent readily gave it back to him. When Henry returned and agent Zarr told him he would have to check the briefcase at the gate, Zarr did not attempt to take the briefcase away from Henry. Henry himself initially took the case to the check-point. Even when the scanner revealed an unidentified object, no one attempted to compel

---

**9.** Because we find that the search was permissible under the consent exception, we need not address the other grounds on which the trial court found the search permissible. Specifically, the trial court found that Henry had abandoned the briefcase, and also that there was

probable cause to search the briefcase (perhaps implying that the search came within the exigent circumstances exception to the Fourth Amendment, *see Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967)).

Henry to open the briefcase. *Compare United States v. DeAngelo*, 584 F.2d 46, 47 (4th Cir. 1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979); *United States v. Freeland*, 562 F.2d at 384; *United States v. Miner*, 484 F.2d at 1076; *United States v. Davis*, 482 F.2d at 896. Rather, Henry was asked if the briefcase could be searched, and when he refused he was given the briefcase and allowed to take it back to the ticket counter to attempt to check it as baggage. Henry had control of the briefcase, and could just as easily have walked out of the airport with it.

Even when Zarr took the briefcase upon Henry's return, his purpose was not to search it, but only to get his supervisor and meet Henry at the check-point. When Zarr and Weber arrived at the check-point, Henry had already proceeded to the gate, but still no one attempted to search the briefcase without consent. Instead the two men left the briefcase at the check-point and went to the gate to attempt to obtain Henry's consent. Weber did not tell Henry he would search the briefcase whether Henry decided to take it with him or not. He repeatedly told Henry the briefcase would have to be searched *if Henry wanted it sent to Dallas.*[10] There were no police of any kind present when the two airline employees sought Henry's consent. Henry finally gave his consent by stating that he needed the bag in Dallas and it was "okay" to search it.

Under these circumstances, it seems clear that Henry knew he could have taken the bag and left the airport. He understood that if he wanted the bag shipped to Dallas it would have to be searched, so he finally consented.

Our opinion is not changed by the fact that Henry was never explicitly told he could refuse to give consent for the search and take the briefcase away. Proof of knowledge of the right to refuse consent is not a necessary prerequisite to a finding of voluntariness. *Schneckloth v. Bustamonte*, 412 U.S. at 232–33, 93 S.Ct. at 2050–51. Rather, the question is whether, looking at all the circumstances, the consent was voluntary. *Id.* We have specifically stated in the context of an airport search:

> We do not hold that the law requires that [the passenger] be told that he had a right not to be searched if he chose not to board the plane. Whether he was so told or not is only one bit of evidence to be considered.

*United States v. Miner*, 484 F.2d at 1077. We note the passage of six years since the *Miner* decision, during which time the public has become increasingly aware of airport search procedures. There were signs at the Tucson airport informing passengers that they could refuse inspection. No one attempted to compel Henry to consent to the search.

Under the totality of the circumstances we hold that the finding of the district court that Henry freely and voluntarily consented to the search is well supported by the evidence and the search of the briefcase was therefore valid.

## II. The Arrest

■ Appellant has also challenged the legality of his arrest at the Dallas-Fort Worth Airport. We need not address this issue because the only evidence introduced at the evidentiary hearing that was considered by the trial judge in determining appellant's guilt was obtained in the search of the briefcase, which we have held was proper. Appellant has not directed our attention to, nor do we find any, evidence bearing on the guilt of the defendant that was obtained as a result of the arrest.

## III. Speedy Trial Rights

Henry also contends that he has been denied his right under the Sixth Amend-

---

**10.** We have no doubt, nor does appellant contend otherwise, that the airline could request inspection of baggage that was suspected to contain hazardous material as a condition to shipping it to Dallas. *See United States v.*

*Gumerlock*, 590 F.2d at 798. The need of airport officials to satisfy themselves that it is safe to accept luggage for transportation is compelling. *United States v. Freeland*, 562 F.2d at 386.

ment to a speedy trial.[11] After dismissal of the original charge on December 19, 1977, Henry was not indicted until August 16, 1978. The hearing on the motion to suppress did not take place until December 4, 1978, and the trial was held on December 14, 1978.

The Sixth Amendment right to a speedy trial does not attach until the defendant becomes an "accused." *United States v. Marion,* 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971). A person becomes an accused when the prosecution is initiated against him either through "a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge." *Id.* at 320, 92 S.Ct. at 463. The Supreme Court has explicitly stated that a person is considered an accused when he is arrested, regardless of when an indictment is finally handed down. *Dillingham v. United States,* 423 U.S. 64, 65, 96 S.Ct. 303, 304, 46 L.Ed.2d 205 (1975). The Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), set forth the nature of the test in determining whether a defendant's Sixth Amendment right has been violated:

> A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

*Id.* at 530, 92 S.Ct. at 2192 (footnote omitted).

Where the delay occurs at the prearrest or pre-indictment stage, however, the delay is evaluated under the due process clause and the defendant bears a heavier burden to establish a constitutional violation. "Pre-indictment delay is permissible unless it violates 'fundamental conceptions of justice which lie at the base of our civil and political institutions'." *United States v. Walker,* 601 F.2d 1051, 1056 (9th Cir. 1979) (quoting *Arnold v. McCarthy,* 566 F.2d 1377, 1381 (9th Cir. 1978)). Under the due process inquiry the court must consider the reasons for the delay as well as the prejudice to the accused. Proof of prejudice is a necessary, but generally not a sufficient, element of the claim. *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977).[12]

Henry was arrested on December 6, 1977. The complaint was dismissed, however, on December 19, 1977. An indictment was handed down on August 16, 1978, over eight months after the arrest. The trial was not held for another four months, a little more than a year after the arrest.

Appellant contends that he was an accused for the entire period and thus the Sixth Amendment standard applies to the entire period. The government, on the other hand, argues that when the charges were dismissed Henry was no longer an accused, and the eight-month period from dismissal to indictment should be analyzed under the due process test. The government contends that the Sixth Amendment standard is applicable only to the time between indictment and trial. Although there is case authority supporting the arguments of both parties, we need not decide under what standard to evaluate the period of time between dismissal of the charges and the

---

11. The Sixth Amendment provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, . . . . ."

12. This required showing of prejudice is the most crucial difference between the Sixth Amendment and the Due Process tests. The Supreme Court has held that an affirmative demonstration of prejudice is not necessary to prove a denial of the constitutional right to a speedy trial, but is only one of the factors to be considered. *Moore v. Arizona,* 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973).

indictment.[13] It is clear that Henry's right to a speedy trial has not been violated whichever standard is applied. Assuming *arguendo* that the *Barker* test applies to the entire period, we hold that there has been no impermissible delay under the *Barker* standard.

■ The length of the delay between the time of Henry's arrest and the time of trial was a little over one year. This court has held periods longer than this to be permissible. *See United States v. Santos*, 588 F.2d 1300, 1302–03 (9th Cir.), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979) (15 months); *United States v. Penland*, 429 F.2d 9 (9th Cir. 1970) (17 months). By itself, a delay of one year does not establish the defendant's claim, although it is a sufficiently lengthy period to warrant close examination of the other factors.

■ The original charges were dismissed at the request of the State of Arizona, so that an investigation by the state into Henry's activities in Arizona could be conducted. An indictment was returned in March of 1978 on the state charges. It appears that the Assistant United States Attorney who initially handled the case had been reassigned to another division of the

United States Attorney's Office in Tucson. The case apparently was neglected by that office until it was reassigned on August 1, 1978, to the Assistant United States Attorney who prosecuted the case. This negligent delay by the government is to be given some weight, although not as much as would be given a deliberate attempt to delay the trial in order to hamper the defense. *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192. We further note that two months of the delay, from the time of the indictment until mid-November, was caused by the defendant's challenge to the removal proceedings brought in Maryland. From the time Henry did appear on October 26, 1978, in Arizona for arraignment on the federal indictment, it was less than two months until trial was held.

The first time the appellant asserted his right to a speedy trial was in a motion to dismiss filed on November 18, 1978. Of course, from the time the charges were dismissed until the indictment was returned on August 16, 1978, there were no charges to which he could have asserted this right. However, Henry's counsel apparently made no objection to the government's motion for dismissal. When he was indicted, he was in Maryland fighting extradition proceedings.

---

**13.** This court recently declined to decide this issue where the delay did not constitute a violation of the defendant's speedy trial rights under either standard. *See United States v. Santos*, 588 F.2d 1300 (9th Cir.), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979). The Seventh Circuit took a similar position. *See Placek v. Illinois*, 546 F.2d 1298 (7th Cir. 1976).

The Tenth Circuit has held the *Barker* test applicable to the period of time between dismissal of the first indictment and return of the second indictment. *See United States v. Merrick*, 464 F.2d 1087 (10th Cir.), *cert. denied*, 409 U.S. 1023, 93 S.Ct. 462, 34 L.Ed.2d 314 (1972) (first indictment dismissed for technical reasons).

The Sixth Circuit, however, has reached the opposite result. *See United States v. Martin*, 543 F.2d 577 (6th Cir. 1976), *cert. denied*, 429 U.S. 1050, 97 S.Ct. 762, 50 L.Ed.2d 766 (1977) (charges originally filed were dismissed and defendant later indicted).

The Fifth Circuit has apparently decided cases both ways. *Compare United States v. Avalos*, 541 F.2d 1100 (5th Cir. 1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d

363 (1977) *and United States v. McKim*, 509 F.2d 769 (5th Cir. 1975) (both applying the *Barker* test) *with United States v. Davis*, 487 F.2d 112 (5th Cir. 1973), *cert. denied*, 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878 (1974) (applying the due process test). We note the language of the court in *Avalos* that "[t]o fail to measure the speedy trial period from initial arrest would allow the government to circumvent the speedy trial requirement by successively dismissing and reinstituting a complaint or indictment for the same offense." *United States v. Avalos*, 541 F.2d at 1108–1109 n.13. We believe that resolution of the issue in this circuit should await a more appropriate set of facts.

Our decision in *Arnold v. McCarthy*, 566 F.2d 1377, is inapposite. In that case we refused to apply the *Barker* standard to the period between dismissal of charges at the request of the government after a mistrial, and subsequent re-indictment of the defendant after further investigation. The defendant in *Arnold* had been tried once and a mistrial had resulted. This does not pose the same opportunity for abuse by the government.

This fight then shifted to federal court to challenge the removal proceedings. In these circumstances we find that the assertion of the right was timely.

Having found the first three factors to be slightly weighted in Henry's favor, we address the important issue of prejudice. When other factors are only slightly weighted in the defendant's favor, this court has found the determining factor to be whether the defendant has been prejudiced by the delay. *See United States v. Santos*, 588 F.2d at 1302–03. The trial judge found, and the defendant concedes, that he has not been prejudiced in any manner in his defense to the federal charges by the delay, nor was he incarcerated for any length of time.

Henry asserts that at the time he was indicted he was in the process of challenging extradition proceedings against him in Maryland, and that the indictment was sought only so he could be removed to the District of Arizona, and then arrested by Arizona state authorities. In this manner, he argues he was denied his right to contest the extradition proceedings. We find no support in the record for this argument. Henry was indicted in good faith by the government, a trial was held, and he was convicted. The trial judge found that there had been no bad faith on the part of the government. We find no evidence to the contrary.

Even if we accepted the defendant's allegations as true, we would not find any prejudice to the presentation of his defense in this action. There might be prejudice to Henry's right to challenge the extradition proceedings on the state charges, but this is an issue pertinent to the state proceedings, not the federal proceedings.

Absent a showing of any prejudice at all, we hold that under the circumstances of this case, Henry has not been deprived of his right to a fair trial by the delay. We agree with the Seventh Circuit that "[t]o hold otherwise would be too nearly tantamount to equating the length of this delay with denial of the Constitutional right." *United States v. DeTienne*, 468 F.2d 151,

158 (7th Cir. 1972), *cert. denied*, 410 U.S. 911, 93 S.Ct. 974, 35 L.Ed.2d 274 (1973).

IV. *Exception to Statute*

Henry contends that he did not have the specific intent to violate the statute because he comes within the exception to the statute. We do not agree.

■ The statute, 18 U.S.C. § 922(e), reads:

> (e) It shall be unlawful for any person knowingly to deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed importers, licensed manufacturers, licensed dealers, or licensed collectors, any package or other container in which there is any firearm or ammunition without written notice to the carrier that such firearm or ammunition is being transported or shipped; except that any passenger who owns or legally possesses a firearm or ammunition being transported aboard any common or contract carrier for movement with the passenger in interstate or foreign commerce may deliver said firearm or ammunition into the custody of the pilot, captain, conductor or operator of such common or contract carrier for the duration of the trip without violating any of the provisions of this chapter.

It is clear from the facts that the defendant did every act necessary to violate the statute. He knowingly delivered the briefcase which he knew contained a firearm to a common carrier for shipment in interstate commerce to persons other than licensed importers, manufacturers, dealers or collectors, without giving written notice that the firearm was being transported. Not only did the defendant fail to give notice that there was a firearm in the briefcase, but he also tried to conceal the fact. He said that "tools and stuff" were in the briefcase when he was questioned as to the contents. The defendant knowingly committed the act the statute specifically prohibits; he contends, however, that he comes within the language of the exception. The well-es-

tablished rule is that a defendant who relies upon an exception to a statute made by a proviso or distinct clause, whether in the same section of the statute or elsewhere, has the burden of establishing and showing that he comes within the exception. *McKelvey v. United States*, 260 U.S. 353, 357, 43 S.Ct. 132, 134, 67 L.Ed. 301 (1922); *United States v. Cartano*, 534 F.2d 788, 791 (8th Cir.), *cert. denied*, 429 U.S. 843, 97 S.Ct. 121, 50 L.Ed.2d 113 (1976); *United States v. Chodor*, 479 F.2d 661, 663 (1st Cir.), *cert. denied*, 414 U.S. 912, 94 S.Ct. 254, 38 L.Ed.2d 151 (1973); *United States v. Ramzy*, 446 F.2d 1184, 1186 (5th Cir.), *cert. denied*, 404 U.S. 992, 92 S.Ct. 537, 30 L.Ed.2d 544 (1971); *Hockenberry v. United States*, 422 F.2d 171, 173 (9th Cir. 1970); *Tritt v. United States*, 421 F.2d 928, 929–30 (10th Cir. 1970); *United States v. Rowlette*, 397 F.2d 475, 479 (7th Cir. 1968).

The appellant has failed to establish that he comes within the exception, for no evidence was presented as to whether Henry owned or legally possessed the firearm.[14] This is a critical fact, especially in light of the legislative history of this statute. The statute was enacted to deal with "the growing use of firearms in violent crime." 1968 *U.S.Code Cong. & Admin. News*, pp. 4410, 4412. The act sets up stringent federal regulations for the regulation of interstate firearms traffic. *See* 1968 *U.S.Code Cong. & Admin.News*, p. 2163 and p. 4410. The inclusion of the words "owns or legally possesses" reflects the intent of Congress that only people who own or legally possess a firearm be allowed to come within the exception.[15] Henry presented no evidence on this point and thus has failed to establish that he comes within the exception.

*Conclusion*

Having carefully reviewed the record we are convinced that the district judge was correct in determining that Henry had consented to the search. We find no violation of Henry's speedy trial rights. Henry has also failed to establish that he comes within the exception to the statute.

For these reasons the judgment is AFFIRMED.

---

14. At oral argument, counsel for appellant was asked whether Henry owned or legally possessed the gun. He replied that there was testimony that the gun was given to him by his former father-in-law and that fact, therefore, established ownership. We have searched the record in vain for such testimony or any other reference to ownership of the gun. We note that the defendant did not testify. Counsel conceded that there was no evidence as to whether Henry legally possessed the gun.

15. We express no view as to whether, even if Henry did own or legally possess the gun, some kind of notice to the common carrier is required. *See United States v. Williams*, 485 F.2d 1383 (4th Cir. 1973), *cert. denied*, 416 U.S. 941, 94 S.Ct. 1947, 40 L.Ed.2d 293 (1974) and *United States v. Burton*, 351 F.Supp. 1372 (W.D.Mo.1972), *aff'd*, 475 F.2d 469 (8th Cir.), *cert. denied*, 414 U.S. 835, 94 S.Ct. 178, 38 L.Ed.2d 70 (1973), both so holding.