UNITED STATES of America

v.

Stanley SULLIVAN, Jr., Defendant.

Crim. No. 81–00016–B.

United States District Court,
D. Maine.

Aug. 4, 1982.

Jay P. McCloskey, Asst. U. S. Atty., Bangor, Maine, for Government.

John L. Carver, Belfast, Maine, Marshall A. Stern, J. Hilary Billings, Bangor, Maine, for defendant.

## MEMORANDUM DECISION AND ORDER ON MOTIONS TO SUPPRESS

CYR, District Judge.

The defendant, under indictment for conspiring to possess and for possessing cocaine, with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1), moves to suppress evidence under Federal Rules of Criminal Procedure 12(b)(3) and 41. The issues were briefed and argued by counsel following the suppression hearing. The within memorandum contains the findings and conclusions contemplated by Federal Rule of Criminal Procedure 12(e).

### I

### THE FACTS

On November 17, 1981, Delta Airline employees Jonathon Davis and Michael Johnson were on duty at the Delta airfreight counter at the Bangor International Airport. While Davis was waiting on airfreight customers shortly before the scheduled departure of Delta flight 323, the defendant, Stanley Sullivan, Jr., entered the airfreight-customer waiting area with a package. Johnson noticed that the defendant appeared "a little bit nervous," walking from one side of the waiting area to the other while Davis was waiting on another customer. When the defendant came to the counter to present the package for ship-

ment, Davis explained the difference between regular Delta airfreight service and Delta Dash service, the latter involving special handling with guaranteed, scheduled delivery. The defendant identified "Sentry Associates" as the shipper, "Prince D. Beach" of "Trilby, Fla." as the consignee, and the contents as "watches." Davis recorded this information on the Delta Dash airbill, which was signed by "Stan Sullivan," and the defendant was given a copy. At the time it was presented, the wrapped package, which was somewhat smaller than a shoe box and very light, bore the handwritten inscription "Do not open until Christmas." The destination of the shipment was given as "Tampa, Florida."

Davis, a "vacation relief" airfreight agent during four or five weeks of the year, considered it unusual for a Christmas package to be sent by Delta Dash, rather than by regular airfreight which is considerably less expensive.[1] Delta Dash from Bangor International Airport is customarily used to transport priority documents, machine parts and small pets. Davis also noted the unusual name of the consignee: "Prince D. Beach."

While overseeing airfreight counter operations, Johnson observed the defendant as he waited to present the package for shipment. After the defendant departed, Davis called Johnson's attention to the package, noting in particular the unusual name of the consignee. Upon examining the pertinent paperwork, Johnson's suspicions as to the contents of the package were aroused by: (1) the absence of a business address for the sender; (2) the unusual nature of the alleged contents, "watches," which he had never before known to have been shipped either by Delta Dash or by airfreight during his entire 14-year tenure with Delta Airlines at Bangor International Airport; and (3) the fact that the shipping charge was paid in cash, which Johnson considered unusual for a business shipment. Johnson took the package to his desk, in the

immediate area of the airfreight counter, where he noticed the "Do not open until Christmas" instruction on the package. Johnson considered it highly unusual that a package, not to be opened "until Christmas," would be shipped on November 17 by Delta Dash for guaranteed, scheduled delivery the same day. Johnson explained that in his long experience Christmas packages are not shipped by airfreight or Delta Dash so long before Christmas, except to remote overseas destinations not serviced by reliable local delivery systems.

Johnson was particularly concerned about the contents of the package because of a rumored report of an incident, two days earlier, involving the appearance at Bangor International Airport of a recently released Bangor Mental Health Institute patient who asked many questions of airline personnel concerning flight departures and shipping.

His suspicions aroused, Johnson consulted the telephone listings and directory assistance for the telephone number of "Sentry Associates." Finding none, he promptly summoned Bangor Police Lieutenant Medford Seabrease, who is in charge of the Bangor International Airport security detail. Johnson informed Seabrease of his concern that the package might not contain "watches," as indicated by the sender, and asked Seabrease to put the package through the airport x-ray scanner used for passenger luggage.

Seabrease, who is trained in the use of the x-ray scanner, viewed the package under the scanner, but could not make out the configuration of its contents; he considered the results of the scan inconsistent with the suggested presence of metallic contents. There were no nongovernmental operators of the x-ray scanner immediately available and Seabrease did not attempt to obtain their assistance. Seabrease promptly advised Johnson that the package did not contain "watch parts." Johnson subjected the package to a Geiger-count reading, in his

---

1. The Delta Dash charge for this package was $40. Regular air freight would have cost $23.

own office and in the presence of Seabrease, with negative results.[2]

By this time both Seabrease and Johnson were concerned about the contents of the package. Johnson was concerned that there might be an explosive in the package and Seabrease was concerned that it might contain either explosives or contraband. Seabrease could not rule out the presence of explosives despite the negative results of the x-ray scan and the Geiger count. On the basis of his experience and training, which includes training in the detection of explosives by x-ray, Seabrease believed that the package could contain a plastic explosive and either a nonmetallic detonation device or a metallic detonation device so small as to be undetectable by the available x-ray and Geiger equipment.

Seabrease contacted the Bangor Police Department in an effort to obtain the assistance of its two-man bomb squad, but both officers were off duty. Johnson stated that the package would have to be opened before it could be allowed aboard an aircraft. Seabrease told Johnson that he felt qualified to open the package. Before he began opening the package, Seabrease saw to it that no one, except Johnson and Davis, remained with him in the vicinity of the airfreight service counter.

The decision by Johnson and Seabrease to open the package was predicated on their common belief that the package could not be placed aboard an aircraft, nor be safely stored or transported due to the unavailability of suitable bomb storage facilities or transportation equipment. Seabrease believed it necessary for the protection of persons and property that the package be opened, although he considered that there was no more than a 50–50 chance that the package contained an explosive.[3]

At the time the package was opened, Seabrease and Johnson were in possession of the following facts: (1) the sender had appeared "nervous;" (2) the use of Delta airfreight service for the shipment of watches was unusual; (3) the use of the relatively expensive Delta Dash service, with guaranteed, same-day delivery, for a mid-November shipment of a package not to be opened until Christmas appeared highly incongruous; (4) there was no telephone listing for the sender "Sentry Associates"; (5) cash payment of the shipping charge by a business shipper was unusual; (6) Lieutenant Seabrease was the only person immediately available having any expertise in dealing with explosives; (7) there were no suitable facilities available for the safe storage or removal of explosives; (8) the contents of the package had been incorrectly identified by the sender; and (9) the x-ray scan and the Geiger count had not ruled out the presence of explosives.

With the permission and assistance of Johnson, Seabrease proceeded to open the package, using a knife to cut a portion of the tape, with Johnson doing likewise. Upon opening the inner container Seabrease and Johnson discovered a dark blue sock, on the outside of which there appeared a white, powder-like substance. Inside the sock there was a small, transparent bag containing a white powder. Seabrease promptly requested the assistance of police personnel more familiar with what Seabrease strongly suspected was an illegal substance. Shortly thereafter, Detective John Welch, a Bangor Police Department investigator, arrived. After consulting with Johnson and Seabrease, Welch took possession of the bag containing the powder and took it to an expert for chemical analysis, which revealed that the white powder was cocaine.

The next day Welch was notified by Johnson that a person identifying himself as Stan Sullivan had telephoned the Delta airfreight office to ask what had happened to the package. Sullivan left his name and a telephone number. Welch checked with the telephone company to determine in

---

**2.** Johnson testified that it had not occurred to him to use the Geiger counter until after Seabrease reported the negative x-ray scan results.

**3.** Seabrease also believed that a search warrant was unnecessary due to the fact that the article in question was an airfreight package.

whose name the number was listed. Welch called the number Sullivan had provided to Johnson, which was listed to Osborn Realty, Belfast, Maine, and asked to speak with Sullivan. Welch represented himself as Michael Johnson, a Delta airfreight office employee, and asked for the number appearing on the Delta Dash airbill in order to locate the package. Sullivan recited the number twice.

On November 21, 1981, DEA Special Agent Michael Cunniff and Sgt. Harry W. Bailey of the Maine State Police, having obtained an arrest warrant, waited for Sullivan to leave his place of employment in Bucksport, Maine. They followed the Sullivan car and pulled in behind it after it came to a stop behind a local bar. After Sullivan exited from his car and while it was still running, the officers approached Sullivan on foot. The officers identified themselves, placed Sullivan under arrest, frisked him and turned the car engine off, simultaneously checking the area around the driver seat. They then searched Sullivan's person, finding the Delta Air Lines Special Handling Airbill which had been filled out by Delta airfreight agent Davis on November 17. *Miranda* warnings were read to Sullivan by Cunniff. Sullivan stated that he did not wish to waive his rights.

Sullivan was taken by Cunniff to the Waldo County Jail. The Sullivan car was driven to the jail by Bailey. Inside the jail, while Bailey was preparing a written inventory of the items found on Sullivan, and upon seeing the Delta Dash airbill, Sullivan said: "You've found what you're looking for. That's all you need." A few moments later Sullivan said: "I put a gram a day into this head of mine." Shortly after this statement Bailey commented: "It looks like you're in a lot of trouble."

During the booking procedure Sullivan asked Cunniff whether his car would be searched. Cunniff responded that it would not be searched without proper authorization or consent. Cunniff then asked Sullivan if he would consent to a search of the vehicle. Sullivan answered that he would

consent. Cunniff typed a consent form containing *Miranda* warnings and advice that Sullivan could refuse to consent to a search of the vehicle. Sullivan initialed each portion of the form, acknowledging that he understood his rights and giving specific permission for the vehicle search.

After the vehicle search Cunniff advised Sullivan that the search had been completed and that a receipt would be prepared for the items seized from the vehicle. Sullivan asked: "What? Paraphernalia?" Cunniff responded affirmatively and answered other questions from Sullivan as to what had been seized.

While Cunniff and Bailey were processing the seized items and preparing the receipt, Sullivan asked: "Can I ask you a question? How come you didn't get the guy at the other end?"

From the time of the arrest until the aforementioned statements Sullivan made no request for an attorney nor did he ask to contact an attorney. Following the statements Cunniff suggested that Sullivan contact an attorney.

The statements were made during booking at the Waldo County Jail, approximately one hour to one and one-half hours after Sullivan was given oral *Miranda* warnings by Cunniff. Some of the statements were made after Sullivan acknowledged his understanding of the *Miranda* warnings provided him by Cunniff at the jail. The statements were not made in response to questioning by the officers, although the officers did respond to questions from Sullivan.

## II

## MOTION TO SUPPRESS PHYSICAL EVIDENCE

The defendant seeks to suppress 31.5 grams of cocaine discovered in the parcel deposited by the defendant for shipment by Delta Airlines, as having been obtained by means of an unreasonable governmental

search.[4] The Government denies that any governmental search was made and further maintains that any warrantless governmental search which did take place was reasonable in these exigent circumstances.

### A. *Private or Governmental Searches*

"[A] wrongful search or seizure by a private party does not violate the [F]ourth [A]mendment and ... such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." *Walter v. United States,* 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980); *see Coolidge v. New Hampshire,* 403 U.S. 443, 487–490, 91 S.Ct. 2022, 2048–2049, 29 L.Ed.2d 564 (1971); *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921). But where governmental involvement is present to the extent that the private person, "in light of all the circumstances of the case, must be regarded as an 'instrument' or agent of the state," 403 U.S. at 487, 91 S.Ct. at 2048, fourth amendment strictures apply.

The First Circuit has recognized that the authority of an airline to conduct private searches of airfreight articles

is rooted in the rule of the common law that common carriers have the right to decline shipment of packages proffered in circumstances indicating contents of a suspicious, indeed of a possibly danger-

ous, nature. Justification for the carrier's refusal is to be found in the exigencies of safeguarding life and property, and undeniably the frustration of criminality is likewise a worthy carrier endeavor. The imperatives of either objective may warrant inquiry by the carrier as to the contents of a parcel tendered for shipment; they may suffice, too, to justify a reasonable inspection of the parcel to fulfill that purpose.

*United States v. Edwards,* 602 F.2d 458, 463 (1st Cir. 1979), *quoting United States v. Pryba,* 502 F.2d 391, 399 (D.C.Cir.1974), *cert. denied,* 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975).

Air tariffs, including airline rules, regulations and practices governing airfreight services, published and filed with the Civil Aeronautics Board pursuant to 49 U.S.C. § 1373(a) and 14 C.F.R. Part 221, may have the practical effect of conferring contractual consent to airfreight inspections. *See United States v. Edwards,* 602 F.2d at 462–63; *United States v. DeBerry,* 487 F.2d 448, 449–50 n.1 (2d Cir. 1973).

Airfreight inspections are predicated on the common law and the contractual rights of the carrier, rather than on statutory rights, and hence are distinguishable from airline passenger and luggage searches conducted pursuant to security screening procedures mandated by law.[5] *See United*

---

**4.** The defendant raises no challenge to the admissibility of the physical evidence seized from his person and vehicle after the arrest.

**5.** Section 202 of the Air Transportation Security Act of 1974, 49 U.S.C. § 1356(a), requires a pre-boarding search of all passengers and their carry-on baggage for weapons and explosives, pursuant to regulations established by the Administrator of the Federal Aviation Administration. Section 204 of the Act, 49 U.S.C. § 1511, requires that carriers refuse to transport passengers and their property in the event consent to a search is withheld. The regulations in force at the time of the present search are codified at 14 C.F.R. § 121.538 (1978), which reads in pertinent part as follows:

. . . .

(b) Each certificate holder shall adopt and put into use a screening system, acceptable to the Administrator, that is designed to prevent or deter the carriage aboard its aircraft

of any explosive or incendiary device or weapon in carry-on baggage or on or about the persons of passengers, except as provided in § 121.585, and the carriage of any explosive or incendiary device in checked baggage. Each certificate holder shall adopt and put into use its security program prescribed in paragraph (c) of this section.

(c) Each certificate holder shall prepare in writing and submit for approval by the Administrator its security program including the screening system prescribed by paragraph (b) of this section, and showing the procedures, facilities, or a combination thereof, that it uses or intends to use to support that program and that are designed to—

(1) Prevent or deter unauthorized access to its aircraft;

*States v. Andrews*, 618 F.2d 646, 649–50 (10th Cir. 1980); *United States v. Edwards*, 602 F.2d at 463–64; *United States v. Gumerlock*, 590 F.2d 794 (9th Cir. 1979).

■ An airfreight search may be deemed "governmental" upon a showing that a government official or agency is "involved either directly as a participant or indirectly as an encourager." *United States v. Walther*, 652 F.2d 788, 791 (9th Cir. 1981) [encouragement by past DEA practice of rewarding airline employee for information]; *see United States v. Gumerlock*, 590 F.2d 794, 800 n.19 (9th Cir. 1979) [airfreight inspection not governmental absent "prior or contemporaneous governmental involvement in the search"]; *United States v. Andrews*, 618 F.2d 646, 650 (10th Cir. 1980) [private search unless employee "acting in collusion with federal officials"]; *United States v. Jennings*, 653 F.2d 107, 110 (4th Cir. 1981) ["incidental, passive involvement of governmental agents" insufficient to constitute governmental search].

The *degree* of governmental involvement required to convert an airfreight inspection into a governmental search is difficult to assess under present case law. The Ninth Circuit has concluded, upon examination of the "wide variety of factual situations" presented in prior cases, that

> [t]he requisite degree of governmental participation involves some degree of knowledge and acquiescence in the search. . . . Mere governmental authorization of a particular type of private search in the absence of more active participation or encouragement is . . . insufficient to require the application of fourth amendment standards. . . . The presence of law enforcement officers who do not take an active role in encouraging or assisting an otherwise private search [is] insufficient to implicate fourth amendment interests, especially where

the private party has had a legitimate independent motivation for conducting the search. . . . [T]he critical factors in the 'instrument or agent' analysis are: (1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search.

*United States v. Walther*, 652 F.2d at 792.

■ Where an airline employee inspects an airfreight package without police assistance, the court must determine the extent to which the search may have been directly or indirectly encouraged by government officials. *See United States v. Jennings*, 653 F.2d 107 (4th Cir. 1981); *United States v. Walther*, 652 F.2d 788 (9th Cir. 1981); *United States v. Andrews*, 618 F.2d 646 (10th Cir. 1980); *United States v. Gumerlock*, 590 F.2d 794 (9th Cir. 1979); *United States v. Cangiano*, 464 F.2d 320 (2d Cir. 1972); *United States v. Krell*, 388 F.Supp. 1372 (D. Alaska 1975). These cases suggest that an airfreight inspection is not converted into a governmental search by the mere communication of information or suspicions to airline personnel by government agents. *See United States v. Jennings, supra; United States v. Cangiano, supra.* There must be some active governmental encouragement as well, whether in the form of a legislative mandate, *see United States v. Gumerlock, supra,* a pattern of monetary rewards, *see United States v. Walther, supra,* or specific, governmental encouragement of the search, *see United States v. Krell, supra.* The uncoached desire of an airline employee to aid law enforcement does not convert an airfreight inspection for illegal drugs into a governmental search. *See United States v. Andrews, supra.*

■ Direct governmental participation in the inspection of an airfreight package has been held to militate heavily against a finding that the search is private, *see Corngold*

(2) Assure that baggage is checked in by a responsible agent or representative of the certificate holder;

(3) Prevent cargo and checked baggage from being loaded aboard its aircraft unless handled in accordance with the certificate holder's security procedures; and

(4) Assure that only persons authorized under § 121.585(a) are permitted to have on or about their persons or property a deadly or dangerous weapon accessible to them while aboard any of its aircraft.

*v. United States*, 367 F.2d 1 (9th Cir. 1966); *United States v. Krell*, 388 F.Supp. 1372 (D. Alaska 1975); *cf. United States v. Gumerlock*, 590 F.2d 794, 800 n.19 (9th Cir. 1979), but the *extent* of the governmental participation remains the critical consideration. *Id.; see also United States v. Henry*, 615 F.2d 1223, 1229–30 (9th Cir. 1980); *United States v. Gomez*, 614 F.2d 643 (9th Cir. 1979); *United States v. Keuylian*, 602 F.2d 1033, 1040 (2d Cir. 1979).

In *United States v. Gomez*, 614 F.2d 643 (9th Cir. 1979), an airport police officer noticed a suitcase which had apparently fallen from a passenger-luggage conveyor belt and brought it to an airline employee, who decided to open the suitcase, which bore no external identification, in order to ascertain the identity of its owner. When the airline employee was unable to open the suitcase, the police officer tapped the lock to release it. This "slight participation" by the police in a search initiated by and in furtherance of the private concerns of the airline was held insufficient to constitute a governmental search. *Id.* at 645; *accord United States v. Lamar*, 545 F.2d 488 (5th Cir. 1977) [airline search of unclaimed bag, in presence of police officer, for purpose of identifying owner].

Where an airport policeman accompanied airline employees to their office and the airline employees opened the suspicious briefcase slightly, revealing a string, but the subsequent search of the briefcase was actually conducted by deputy sheriffs outside the airport, "substantial governmental involvement" rendered the search governmental. *United States v. Henry*, 615 F.2d 1223, 1229–30 (9th Cir. 1980). Where airline employees opened luggage believed to contain guns and handed the guns to a police officer to be inventoried, the governmental participation was held to be insufficient to implicate the fourth amendment. *United States v. Keuylian*, 602 F.2d 1033, 1040 (2d Cir. 1979). In *United States v.*

*Capra*, 372 F.Supp. 603 (S.D.N.Y.1973), *aff'd* (in dictum), 501 F.2d 267, 272–73 n.4 (2d Cir. 1974), railroad employees became suspicious after a suitcase was left unclaimed in the railroad baggage room for several days, a highly unusual occurrence. Their suspicions were further aroused by the weight of the suitcase and a "rustling sound like cellophane or plastic" when the suitcase was moved. Concerned about the security of the suitcase and suspicious that it might contain explosives, the railroad employees contacted the police. The following day, after calling in police experts on explosives and locks, the railroad employees, who had been unable to open the suitcase, stood by as the police opened the suitcase and discovered illegal drugs. The district court held that the search was not governmental because

> ... it was undertaken by private persons acting upon suspicions touching legitimate concerns of their own and their employer. But for their inability to open the suitcase by themselves without damaging it, the railroad employees would never have involved the police.... [T]he occasion for [the] presence [of the police] was primarily service to those who had enlisted their aid rather than the pursuit or detection of criminals. Undoubtedly, they were prepared to be interested in evidence of criminal conduct. But they were not required to have a search warrant for the precautionary assistance they came to supply.

*Id.* at 608–609.[6]

## B. *The Subject Searches*

■ It is clear that the actual opening of the airfreight package in this case constituted a search, but x-ray scans and metal detection scans may also be considered searches. *See United States v. Henry*, 615 F.2d 1223, 1227 (9th Cir. 1980); *United States v. Haynie*, 637 F.2d 227, 230 (4th Cir.

---

**6.** *Capra* has been criticized for reaching the right result for the wrong reason:

> Instead of struggling to find a basis for saying that a police detective's actions in picking a suitcase lock was not governmental con-

duct, it would be better to conclude that there *was* a governmental search which was reasonable in light of the purposes for which it was undertaken....

1 W. LaFave, *Search & Seizure*, § 1.6, at 120.

1980), *cert. denied*, 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 351 (1981); *United States v. Epperson*, 454 F.2d 769, 770 (4th Cir.), *cert. denied*, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972) [use of magnetometer constitutes search].

Unlike the scans in *Henry, Haynie,* and *Epperson*, the x-ray scan and the Geiger count conducted in this case merely enabled Seabrease and Johnson to rule out the presence of the declared contents. Yet that *information* significantly contributed to their decision to conduct a physical search of the package. The discovery that the package did not contain watches was no less significant, in the present circumstances, than was the revelation of an unidentifiable "dark object" in *Henry* or of a "rectangular package" in *Haynie.*

Three searches are involved in this case.[7]

### 1. The X-ray Scan

■ Prior to the x-ray scan, Johnson conveyed very little information to Lieutenant Seabrease, except that he did not believe that the package contained watches. Johnson was not qualified to operate the x-ray scanner. It appears that the nongovernmental personnel who operate the x-ray scanner during the intermittent airline passenger boardings at Bangor International Airport were not at the scanner when Seabrease arrived with the package.[8] Although Seabrease conducted the x-ray scan without the assistance or presence of airline personnel, he acted solely at the request and for the purpose of assisting Johnson. None of the circumstances which led Johnson to suspect that the package did not contain watches were conveyed to Seabrease at this time, although that suspicion was itself communicated. There is no suggestion that Seabrease had any interest or suspicion at that time which could have given rise to an independent governmental purpose for scanning the package, beyond rendering technical assistance to Johnson. The provision of police assistance at the request of an airline employee, who has decided to make an inspection, normally does not render the search governmental. *Cf. United States v. Jennings*, 653 F.2d 107 (4th Cir. 1981); *United States v. Gomez*, 614 F.2d 643 (9th Cir. 1979); *United States v. Keuylian*, 602 F.2d 1033 (2d Cir. 1979).

■ The decision to conduct the x-ray scan was in no way instigated or encouraged by Seabrease. *Compare Corngold v. United States*, 367 F.2d 1 (9th Cir. 1966) [where government agent requested airline employee to open package, and assisted], *with United States v. Krell*, 388 F.Supp. 1372 (D.Alaska 1975) [where police advised airline employee of their suspicions and "reminded" employee of his right to inspect the package]. Delta Airlines had an independent right to conduct an x-ray scan in these circumstances, *see United States v.*

---

**7.** During the cross-examination of government witnesses, counsel for the defendant appeared to contend that the opening of the sock constituted a distinct search requiring separate judicial scrutiny. The sock, enclosing the package of cocaine, had a white powder-like substance on its exterior, apparently due to spillage or leakage. Due to the presence of powder on the outside of the sock, its contents could be "objectively known, or at least reasonably believed to be known, by external inspection, without opening [the sock]," *see United States v. Weber*, 668 F.2d 552, 562 (1st Cir. 1981), *cert. denied*, — U.S. —, 102 S.Ct. 2904, 73 L.Ed.2d 1313 (1982). Therefore, the defendant had no reasonable expectation of privacy in the sock, such as would implicate the fourth amendment warrant clause. *See Arkansas v. Sanders*, 442 U.S. 753, 764, 99 S.Ct. 2586, 2593, 61 L.Ed.2d 235 (1979); *United States v. Weber*, 668 F.2d at 561–62 [reasonable expectation of privacy in

rolled-up rainslicker because officers could not "see through, or alternatively, know the contents from a tell-tale shape"]; *United States v. Buettner-Janusch*, 646 F.2d 759, 766–67 (2d Cir. 1981) [whitish granular substance, believed to be methaqualone, visible through translucent walls of containers]; *United States v. Dien*, 609 F.2d 1038, 1045 (2d Cir. 1979) [although agents detected odor of marijuana emanating from van, defendant manifested reasonable expectation of privacy in sealed cardboard boxes inside van].

**8.** Airline x-ray-scanner operators are not on continuous duty at BIA. They return to their homes after a flight has been boarded. There is no evidence that any of these personnel were at the airport when Seabrease operated the scanner, but he stated that he would ordinarily have enlisted their aid had they been available.

*Edwards*, 602 F.2d at 463, and the technical assistance of Lieutenant Seabrease was enlisted directly and exclusively in aid of a legitimate, private airline purpose. The x-ray scan was a private search.

### 2. The Geiger-count Reading

After the x-ray scan and on his own initiative Johnson subjected the package to a Geiger-count reading, using airline equipment kept in his desk. Although present at the time, there is no evidence whatever that Seabrease participated in any way. With his suspicions substantially confirmed that the contents of the package were not as declared, Johnson should indeed have been seriously concerned as to the true nature of the contents of a package accepted for immediate shipment aboard two *specific* Delta Airline flights [323 and 937] between Bangor, Boston and Tampa. Johnson's consistent concern that the package might contain an explosive device loomed

larger than ever. The Geiger-count reading was not suggested, encouraged or assisted by Seabrease, but was an exercise of the "common law right [of the airline] . . . to inspect and refuse shipment of parcels of a suspicious, possibly dangerous, nature." *United States v. Edwards*, 602 F.2d at 464.[9]

### 3. The Opening of The Package

By the time the opening of the package was undertaken, Johnson had further informed Seabrease that: (1) the sender had appeared nervous while waiting to present the package for shipment; (2) no telephone listing could be found under the name of the designated shipper; and (3) Delta Dash service is not normally used for such shipments and business shippers seldom pay airfreight charges in cash. It is reasonable to assume that Seabrease had also observed for himself the "Do not open before Christmas" label, as well as the name and address

**9.** Although the defendant insists that inspection of the airfreight package constituted a governmental search, he does so on the basis that the active participation of Lieutenant Seabrease made it so, rather than that the actions of the airline employee were undertaken pursuant to air-cargo screening procedures mandated by Congress, *see* 49 U.S.C. § 1511(a)(2), and by regulations adopted in accordance therewith, *see* 14 C.F.R. § 121.538(c)(3). The First Circuit has held that section 204(a)(2) of the Air Transportation Security Act of 1974, 49 U.S.C. § 1511(a)(2), does "not require security screening or searches of parcels shipped in air freight by persons who are not passengers . . .," *United States v. Edwards*, 602 F.2d 458, 464 (1st Cir. 1979), relying on *United States v. Gumerlock*, 590 F.2d 794 (9th Cir. 1979) (*en banc*). In *Gumerlock*, the Ninth Circuit concluded that the burden of establishing government involvement in an airfreight search is upon the defendant. *Id.* at 799. The record in *Gumerlock* was silent as to whether the airline had "in fact adopted any security procedures with respect to cargo [pursuant to 49 U.S.C. § 1511(a)(2) and 14 C.F.R. § 121.538(c)(3)], or, if it did, whether the procedures include inspections approved by the administration [F.A.A.]." *Id.* Accordingly, the Ninth Circuit assumed that United Airlines had not adopted such procedures and held the search nongovernmental in nature. *Id.* The First Circuit, in *Edwards*, accepted the reasoning of the Ninth Circuit in *Gumerlock*, without comment as to whether the record in *Edwards* was similarly devoid of evidence of the adoption of approved regulations by the airline in that case. But it may be

significant that the same airline [United] was involved in both *Gumerlock* and *Edwards.* In the present case, however, the Delta airfreight supervisor at Bangor International Airport testified that the subject Delta Dash shipment was governed by Delta Air Lines, Inc. Stations Bulletin No. 75–B44 (December 24, 1975), entitled 'Cargo Security Screening,' which is described as "a logical extension of the security screening program in effect for air carriers . . . *agreed on. . . .*" by the F.A.A. and the carriers as security measures for air cargo. *See* Appendix A.

Assuming that the distinction between the present case and *Gumerlock* would call for a different conclusion concerning the governmental nature of the x-ray scan and Geiger-count scan, the Court concludes that these scans were reasonable governmental intrusions, as a pre-loading precaution, considering the suspicious circumstances surrounding the presentation of the package, and the unusual use of Delta Dash for delivery of a package in November which was not to be opened until Christmas. Applying the rationale of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to this case, the limited nature of the intrusions, balanced against the significant governmental interest in preventing the loading of explosives aboard an aircraft, calls for a conclusion the inspections were reasonable in light of the suspicious circumstances. *Cf. United States v. DeAngelo*, 584 F.2d 46, 47 (4th Cir. 1978); *United States v. Homburg,* 546 F.2d 1350, 1352–53 (9th Cir. 1976).

of the consignee.[10] By this time, Lieutenant Seabrease was highly suspicious as to the contents of the package, having recognized that it might very well contain either contraband or explosives.

Seabrease was the first to mention the opening of the package and took the lead in doing so. Seabrease asked Johnson whether the airline would object to the package being opened. Johnson said that he would have to open it anyway. Seabrease declared that he felt qualified to do it. There is no evidence that Johnson had any experience or training in the detection or handling of explosives. Seabrease made sure that no unnecessary persons were in the vicinity and expressed reluctance at having Johnson and Davis remain.

Classification of the hand search conducted in this case presents a close question. The defendant insists that the encouragement and assistance of Lieutenant Seabrease made the hand inspection of the package a governmental search. The Government strenuously disagrees, contending that it was a private search. Under the existing case law, it may be that the governmental encouragement, participation and interest in obtaining evidence of criminal activity were sufficient to render the search governmental in nature.[11] Cf. United States v. Henry, 615 F.2d 1223 (9th Cir. 1980); United States v. Gumerlock, 590 F.2d 794, 800 n.19 (9th Cir. 1979); Corngold v. United States, 367 F.2d 1 (9th Cir. 1966); United States v. Krell, 388 F.Supp. 1372 (D.Alaska 1975). But cf. United States v. Jennings, 653 F.2d 107 (4th Cir. 1981); United States v. Gomez, 614 F.2d 643 (9th Cir. 1980); United States v. Capra, 372 F.Supp. 609 (S.D.N.Y.1973), aff'd (dictum), 501 F.2d 267, 272 n.4 (2d Cir. 1974). Be-

cause the Court is satisfied that the hand search of the package was in any event reasonable, it is unnecessary to determine whether in these circumstances there was sufficient police encouragement, participation and interest to render it a governmental search.

C. *Reasonableness of the Search*

In order for a governmental search to satisfy the requirements of the fourth amendment, it must be "reasonable." See South Dakota v. Opperman, 428 U.S. 364, 370, 373, 96 S.Ct. 3092, 3097–3098, 49 L.Ed.2d 1000 (1976); Cady v. Dombrowski, 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973); Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). A governmental search must normally be conducted pursuant to a warrant issued on probable cause, as required by the warrant clause of the fourth amendment. Arkansas v. Sanders, 422 U.S. 753, 758, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (1979). Since the hand search of the airfreight package was undertaken without a warrant, it is necessary to determine whether one of the "few well-delineated" exceptions to the warrant requirement is applicable. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

1. *Third-Party Consent*

The Government maintains that the hand inspection of the package was a private search conducted by the air carrier pursuant to its contract with the defendant and the controlling airfreight regulations. The Court is persuaded that the contractual and common-law rights of the air carrier authorized its own inspections. See United States v. Edwards, 602 F.2d 458, 463–64 (1st Cir. 1979).

**10.** There is no evidence that Seabrease was aware of the rumored reports that a recently released Bangor Mental Health Institute patient had recently inquired at the airport about airline departures and shipping.

**11.** It must be observed, however, that governmental encouragement did not in fact instigate the hand search. Johnson flatly stated that he was going to have to search the package in any event before it could be placed aboard an air-

craft. Furthermore, the legitimate private interests of the airline in opening the package, the prevention of injury to persons and property, were by no means rendered subordinate to the governmental interests. Even the governmental interest seems to have consisted as much in providing needed technical assistance for the protection of persons and property as in the detection of evidence of a crime. See note 15, infra.

The further question is whether in these circumstances the third-party consent of the airline validated any warrantless governmental search.

The Ninth Circuit rejected the third-party consent rationale in *United States v. Corngold*, 367 F.2d 1, 6–8 (9th Cir. 1966), involving a governmental search of an airfreight package suspected of containing smuggled watches. Relying on *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), the Ninth Circuit concluded that because "TWA and its employees had no right of access to appellant's package independent of appellant's consent" [*but see United States v. Edwards*, 602 F.2d 458, 463–64 (1st Cir. 1979)] and "the inspection clause in TWA's tariff authorized examination only by the carrier itself," the governmental search could not be sustained on the basis of the consent of the airline. 367 F.2d at 6–8.[12] The *Corngold* court thus understandably viewed *Stoner* as requiring the consent of the defendant or his *agent*.

The Supreme Court again considered the requirements of a valid third-party consent in *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Following the arrest of the defendant in the yard of the house where he lived, another occupant, at the request of the police, consented to a governmental search of the house, including the bedroom she shared with the defendant. The Court upheld the warrantless search based on third-party consent:

... [W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over *or other sufficient relationship* to the premises or effects sought to be inspected....

415 U.S. at 171, 94 S.Ct. at 993 (*emphasis added*). *Matlock* directs inquiry into whether the third party is empowered, *in its own right*, to permit a governmental search. *Matlock* also discussed an earlier case involving third-party consent to a governmental search of a duffel bag:

In *Frazier v. Cupp*, 394 U.S. 731, 740 [89 S.Ct. 1420, 1425, 22 L.Ed.2d 684] (1969), the Court 'dismissed rather quickly' the contentions that the consent of the petitioner's cousin to the search of a duffel bag, which was being used jointly by both men and had been left in the cousin's home, would not justify the seizure of petitioner's clothing found inside; joint use of the bag rendered the cousin's authority to consent to its search clear. Indeed, the Court was unwilling to engage in the 'metaphysical subtleties' raised by Frazier's claim that his cousin only had permission to use one compartment within the bag. By allowing the cousin the use of the bag, and by leaving it in his house, Frazier was held to have *assumed the risk* that his cousin would allow someone else to look inside.

415 U.S. at 170–71, 94 S.Ct. at 993 (*emphasis added*).[13]

---

**12.** In *Stoner v. California, supra,* the Supreme Court invalidated a hotel-room search conducted with the consent of the hotel clerk, but without the consent of the defendant-occupant, on the following grounds:

It is important to bear in mind that it was the petitioner's constitutional right which was at stake here, and not the night clerk's nor the hotel's. It was a right therefore, which only the petitioner could waive by word or deed either directly or *through an agent.* It is true that the night clerk clearly and unambiguously consented to the search. But there is nothing in the record to indicate that the police had any basis whatsoever to believe that the night clerk had been autho-

rized by the petitioner to permit the police to search the petitioner's room.

376 U.S. at 489, 84 S.Ct. at 893 (*emphasis added*).

**13.** It has been suggested, however, that

not all bailment situations involve giving the bailee this degree of control over the object, and thus it cannot be said that *Frazier* stands for the general proposition that bailed personalty may always be searched with the consent of the bailee.

Of obvious importance in making the assumption of risk analysis is the extent to which the bailor made efforts to secure, even as against the bailee, the privacy of his effects.

In *Matlock* and *Frazier* the consenting third parties plainly possessed rights of access sufficient to support the requisite showing of "common authority," based on their authorized use of the premises or objects searched, in common with the defendants. *See* 415 U.S. at 171, n.7, 94 S.Ct. at 993 n.7. But the Court went on to state in *Matlock* that some "other sufficient relationship to the premises or effects sought to be inspected" may serve as an adequate alternative to a showing of "common authority." 415 U.S. at 171, 94 S.Ct. at 993. Several courts have relied upon the *Matlock* language in sustaining governmental searches of objects or containers over which the consenting third party exercised some measure of custody or control short of "common authority." *See United States v. Sellers*, 667 F.2d 1123, 1126 (4th Cir. 1981) [neighbor holding defendant's personal effects for safekeeping]; *United States v. Miroff*, 606 F.2d 777 (7th Cir. 1979) [owner of home in which defendants had left belongings], *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980); *United States v. Walker*, 575 F.2d 209 (9th Cir.) [messenger enlisted by co-owner of defendant's photographs to deliver photographs to jail inmate], *cert. denied*, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 325 (1978). *But see United States v. Presler*, 610 F.2d 1206, 1213–14 (4th Cir. 1979) [friend could not consent to police search of locked briefcase left with him by defendant where friend had no key and claimed no right of access]; *United States v. Block*, 590 F.2d 535, 541–42 (4th Cir. 1978) [mother could not consent to search of son's secured footlocker which was for his exclusive use]; *United States v. Diggs*, 569 F.2d 1264 (3d Cir. 1977) [uncle with whom defendant had left locked box for safekeeping could not consent to police search ]; *United States v. Wilson*, 536 F.2d 883, 884–85 (9th Cir. 1976) [apartment holder could not consent to search of defendant's suitcases where she "disclaimed any ownership or possessory interest in them"]; *United States v. Humphrey*, 456 F.Supp. 51, 63–64 (E.D.Va.1978) [where messenger was instructed by defendant to deliver sealed envelopes across international border, messenger could not consent to opening of envelopes on request of F.B.I.]. The Second Circuit has articulated the following rule: "Consent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." *United States v. Buettner-Janusch*, 646 F.2d 759, 765 (2d Cir.), *cert. denied*, 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981), *quoting United States v. Gradowski*, 502 F.2d 563, 564 (2d Cir. 1974) (*per curiam*).

Where a locked container is left with a bailee who has no key and claims no right of access, it seems clear that the bailor has assumed little risk of its inspection by anyone. *See United States v. Presler, supra; United States v. Diggs, supra; cf. United States v. Miller, supra.* But where restrictions on access are neither imposed by the bailor nor fairly inferable from the surrounding circumstances, courts have held that the bailor assumed the risk that the bailee might consent to a governmental search. *See United States v. Sellers, supra; United States v. Miroff, supra; United States v. Walker, supra.*

The refusal to validate the governmental search of an airfreight package in *Corngold* was based on the finding that the defendant had not "impliedly authorized" the air carrier to consent to a governmental search, because the "package, securely wrapped and tied, was delivered to the airline solely for transportation . . ., and the inspection clause in the [air carrier's] tariff authorized examination only by the carrier itself." 367 F.2d at 7–8. *Corngold* turns upon the agency analysis suggested in *Stoner v. California, supra.* The more recent Supreme Court decisions, in *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) and *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), proceed well beyond *Stoner.* Under the analyses employed in *Frazier* and *Matlock* the defendant need not have *authorized* the bailee

to consent to an inspection; it is enough that he *assumed the risk* of an inspection.

The bailment of a *locked* container, without more, connotes little in the way of authorization *or* assumption of the risk of inspection by anyone, including the bailee. Similarly, the bailment of a securely wrapped package for safekeeping militates heavily against an inference that the bailor assumed the risk that the bailee might examine its contents or "allow someone else to look inside," *Frazier v. Cupp*, 394 U.S. at 740, 89 S.Ct. at 1125.

■ Air carriers are not mere gratuitous bailees of articles accepted for shipment, by reason of their common-law and contractual [14] rights to inspect air cargo, *see United States v. Edwards*, 602 F.2d 458, 462–64 (1st Cir. 1979), and their well-known use of extraordinary security measures for the protection of persons and property.

■ Although under *ordinary* circumstances the consignor of an airfreight shipment may assume little risk of its inspection, the actions of the consignor may provide relevant circumstantial evidence that the consignor assumed the risk of an inspection by the air carrier. After waiting nervously to present for shipment an airfreight package whose contents the airline could not determine safe for shipment except by inspection, the defendant mislabeled the contents of the package; either misidentified the consignor or identified an actual consignor whom the air carrier could not contact; signed the airbill illegibly; and obligated the air carrier (in mid-November) to ship the package aboard the next flight, notwithstanding the substantially greater cost of Delta Dash service and the fact that the package prominently displayed the instruction that it not be opened until Christmas. These actions of the defendant evidenced more than an assumption of the risk of an inspection, they invited inspection by any responsible air carrier concerned for the "frustration of criminality," *see United States v. Edwards*, 602 F.2d at 463, or the "safeguarding of persons and property," *see id.*, by prompting entirely reasonable suspicions which could not be dispelled except by inspection.

■ The actions of the defendant assumed the further risk that the air carrier might require precautionary police assistance in searching a package reasonably suspected by the air carrier to contain explosives. Where the circumstances warrant an airfreight inspection for suspected dangerous materials, an air carrier need not jeopardize its own or other persons and property by foregoing the technical assistance reasonably required in the circumstances merely because it is provided by government.

■ In *United States v. Diggs*, 569 F.2d 1264 (3d Cir. 1977), the court held that where the defendant had left a locked metal box for safekeeping with her uncle, who

**14.** The Delta Dash airbill executed by Sullivan upon acceptance of the package for shipment contained the following provision:

CONDITIONS OF CONTRACT

. . . .

It is mutually agreed that the goods described herein is (sic) accepted on the validation date hereof in apparent good order (except as noted) for carriage as specified herein, subject to governing classifications and tariffs in effect as of the date hereof which are filed in accordance with law. Said classifications and tariffs are available for inspection by the parties hereto and are hereby incorporated into and made a part of this contract.

The Delta airfreight supervisor at B. I. A. testified that, on November 17, 1981, Delta cargo shipments were subject to the regulations contained in a two-page bulletin. (*See* Appendix A.)

It is unclear whether these procedures are "tariffs" filed with the Civil Aeronautics Board in accordance with 14 C.F.R. Part 221, or Delta "security program" procedures required to be filed and approved by the F.A.A. pursuant to 14 C.F.R. § 121.538(c); although they appear to be the latter.

There is no evidence that the defendant was actually aware of these inspection provisions and therefore it cannot be said that he expressly consented to the scans and the hand search. But these regulations indicate that Delta, as an airfreight carrier, has rights of inspection, *see United States v. Edwards*, 602 F.2d at 462–64, neither claimed nor possessed by a gratuitous bailee absent the express consent of the bailor. *Compare United States v. Presler*, 610 F.2d 1206, 1213–14 (4th Cir. 1979); *United States v. Diggs*, 569 F.2d 1264 (3d Cir. 1977).

became concerned that it might contain evidence of a crime, the legitimate interest of the bailee in exculpating himself warranted surrender of the box to the police, but not the ensuing warrantless search. In the instant case it cannot be said that the legitimate interests of the air carrier in protecting persons and property would be alleviated merely by surrendering the package to the police. The air carrier had a continuing contractual obligation to protect the contents and to ship the package as agreed, once it was determined that it was safe to do so.[15] The absence of safe storage and transportation facilities left no reasonable alternative except an immediate inspection.[16] These extraordinary circumstances warranted consent by the air carrier to a governmental search *in its own right.*

The reasonableness of the governmental search is not predicated on third-party consent alone.

### 2. *Exigent Circumstances*

 The prosecution's primary argument is that the customary probable cause and warrant requirements of the fourth amendment were inapplicable in the exigent circumstances of the present case. The warrant requirement may be dispensed with where resort to a warrant might endanger the police or the public. *See, e.g., Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973) [con-

cern for public safety where intruder might remove revolver from trunk of vehicle]. A reasonable belief that explosives may be present is sufficient to justify an immediate warrantless search, although other persons are effectively denied access to the suspected explosives. *See United States v. Williams,* 626 F.2d 697, 703 (9th Cir.), *cert. denied,* 449 U.S. 1020, 101 S.Ct. 586, 66 L.Ed.2d 482 (1980); *United States v. Chadwick,* 443 U.S. 1, 15 n.9, 97 S.Ct. 2476, 2485 n.9, 53 L.Ed.2d 538 (1977) (dictum) ["If officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon."][17]

 There is no requirement that a search warrant be obtained prior to inspecting a container for explosives, since a self-detonating bomb, unlike a gun, represents a dangerous instrumentality, notwithstanding the fact that access to it is prevented. *Cf. United States v. Irizarry,* 673 F.2d 554, 559 n.* (1st Cir. 1982). In order to invoke this exception to the warrant requirement, the circumstances surrounding the search must support the asserted exigency. *See United States v. Dugger,* 603 F.2d 97, 99 (9th Cir. 1979). Certainly, where the asserted exigency results from the need to discover and render harmless a suspected explosive de-

---

**15.** The consent of the air carrier to police participation was motivated by its need to assure itself, prior to shipping or storing the package, that the contents posed no danger to persons or property in the vicinity. *Cf. United States v. Miller,* 589 F.2d 1117, 1125 (1st Cir. 1978) [boarding of boat "was justified by need to clear the vessel of its fouled moorings and secure it to a nearby dock, as the owner of the mooring desired"].

**16.** The decision of the airport security officer to participate and assist in opening the package was based on his belief that the airfreight supervisor was authorized to permit inspection. The Supreme Court in *Matlock* did not decide whether a governmental search may be considered reasonable, even in the absence of a sufficient third-party consent, on a showing that "the searching officers *reasonably believed* that ... [the consenting party] had sufficient authority ... to consent to the search." 415

U.S. at 177 n.14, 94 S.Ct. at 996 n.14. Other courts have looked to the reasonableness of the belief on the part of the police that the third-party was authorized to consent to the search. *See United States v. Sellers,* 667 F.2d 1123, 1126 (4th Cir. 1981); *United States v. Block,* 590 F.2d 535, 539–40 (4th Cir. 1978); *United States v. Isom,* 588 F.2d 858, 861 (2d Cir. 1978); *United States v. Peterson,* 524 F.2d 167, 180 n.20 (4th Cir. 1975). Having been made aware of the suspicious circumstances and the determination of the airfreight supervisor to inspect the package, it was entirely reasonable for the airport security officer to believe that the airfreight supervisor was authorized to permit him to render technical assistance in opening the package.

**17.** To this, it is devoutly to be hoped, should be added the observation that it would be "foolhardy to transport it to the [courthouse]" for purposes of obtaining a search warrant.

vice, rather than to secure evidence of a crime, and where all other reasonably practicable means of excluding the presence of explosives have been exhausted, the traditional probable cause requirement is not applicable. *Compare United States v. Place,* 660 F.2d 44 (2d Cir. 1981) [probable cause required for seizure of baggage for purpose of determining presence of narcotics], *cert. granted,* —— U.S. ——, 102 S.Ct. 2901, 73 L.Ed.2d 1312 (1982), *with United States v. Homburg,* 546 F.2d 1350 (9th Cir. 1976) [search of suitcase for bomb in airport "reasonable" under *Terry* balancing approach].

■■■■ In the context of an airport inspection for explosives, x-ray scans of carry-on luggage at boarding gates are considered reasonable regulatory searches because of their quasi-consensual nature, the absence of stigma due to their routine, nondiscriminatory nature, and the substantial governmental interest in preventing hijackings. *See United States v. Smith,* 643 F.2d 942, 944 (2d Cir. 1981); *United States v. Wehrli,* 637 F.2d 408, 409 (5th Cir.), *cert. denied,* 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958 (1981); *United States v. Henry,* 615 F.2d 1223, 1228–29 (9th Cir. 1980); *United States v. Haynie,* 637 F.2d 227, 230 (4th Cir. 1980); *United States v. DeAngelo,* 584 F.2d 46, 47–48 (4th Cir. 1978); *United States v. Davis,* 482 F.2d 893 (1973).[18] Unlike pre-boarding searches of passengers and carry-on luggage, once a passenger has decided *not* to take an article on board the aircraft an inspection cannot be justified as a routine, nondiscretionary, administrative search because "the need to prevent weapons and explosives from being carried on board" no longer exists. *See United States v. Davis,* 482 F.2d 893, 911 (9th Cir. 1973); *cf. United States v. Wehrli,* 637 F.2d at 409 n.1 ["sharp distinction" between pre-board-

ing search and general, airport-area search]. *But cf. United States v. Haynie,* 637 F.2d 227, 230–31 (4th Cir. 1980) [attempt to withdraw from pre-boarding screening process does not vitiate consent to search].

The exigency in the present case was a continuing one. The potential danger to persons and property in the vicinity of the package would have persisted whether the package had been placed aboard an aircraft, held in the terminal, or transported elsewhere. Under similar circumstances warrantless airport searches have been upheld, not as routine pre-boarding searches, but as reasonable public safety inspections on the authority of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See United States v. Homburg,* 546 F.2d 1350 (9th Cir. 1977) [where airport bomb threat had been received and security officers reasonably believed that passenger had removed rectangular object from inside trousers and placed it in suitcase just prior to standing nervously in boarding line, hand search of suitcase was held reasonable even though owner wished to leave the boarding area, due to "immediate and compelling interest in taking steps to [ensure] that [subject] did not detonate an explosive in the air terminal"]; *United States v. Legato,* 480 F.2d 408 (5th Cir. 1973) [where anonymous bomb tip had been received and parcel matched description in tip, hand search held reasonable, even though owner decided to exit with package prior to security screening, in view of suspicious behavior of owner and the danger to persons in the vicinity if bomb were detonated]. Even in the absence of a bomb threat or tip, the Fourth Circuit has upheld the hand search of a briefcase, which appeared "black" under an x-ray scan, although the owner declined to board the flight upon being told that the briefcase

---

**18.** Where an x-ray scan discloses a suspicious or unidentifiable object, airport officials may conduct a hand search of luggage to determine the nature of the contents, as a prerequisite to boarding aircraft. *See United States v. Smith, supra* [appearance on x-ray screen of unidentifiable mass justified further search of bag]; *United States v. Wehrli, supra,* [x-ray disclosure of cylinders and wiring rendered hand

search reasonable]; *United States v. Clay,* 638 F.2d 889 (5th Cir. 1981) [appearance of unidentifiable dark object on x-ray screen justified hand search], *cert. denied,* 451 U.S. 917, 101 S.Ct. 1996, 68 L.Ed.2d 310 (1981); *United States v. DeAngelo, supra* [hand search reasonable where large portion of brief case appeared "black," indicating that it could not be adequately inspected except by hand].

would have to be opened, because the circumstances were "sufficiently suspicious" to justify "opening [the briefcase] to determine whether he was carrying a gun or explosive device which would pose an immediate danger to persons in the vicinity if the briefcase were returned to him." *United States v. DeAngelo*, 584 F.2d 46, 47 (4th Cir. 1978) (alternate ground), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979).[19]

In the exigent circumstances of the present case the protection of persons and property was no less imperative than the "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Viewed in context and without the benefit of hindsight, the actions of the airline personnel and airport security officer comported with their genuine suspicions that the package might contain explosives, *cf.* 392 U.S. at 28, 88 S.Ct. at 1883, suspicions which the Court considers would have been shared by other persons of "reasonable caution," *id.* at 22, 88 S.Ct. at 1880.

■■■ There is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." *Camara v. Municipal Court*, 387 U.S. 523, 534–535, 536, 537, 87 S.Ct. 1727, 1733–1734, 1735, 18 L.Ed.2d 930 (1967). The acceptance of the package for scheduled airfreight delivery, coupled with the unsuccessful attempt to contact the shipper immediately after the airfreight supervisor became concerned for the safety of persons and property, left no prudent alternative but the immediate inspection of the package, which was promptly accomplished in three successive steps only as required to rule out the presence of explosives. *See Terry v. Ohio*, 392 U.S. at 30, 88 S.Ct. at 1884. The inability to rule out the presence of explosives by means of the x-ray and Geiger-counter scans, together with the unavailability of suitably trained airline personnel or safe storage and transportation facilities, amply justified the air carrier's enlistment of the technical assistance proffered by the airport security officer in conducting an immediate hand search. It was utterly impracticable for the police to obtain a search warrant in these circumstances. *See id.* at 20, 88 S.Ct. at 1879.

■■■ The governmental interest in conducting an immediate warrantless search must be balanced against the privacy interest of the defendant in the package. In view of the well-known use by airlines on a nationwide basis of intrusive procedures for screening persons and property going aboard commercial aircraft, and of the designation by the defendant of a consignor whom the air carrier could not contact, the reasonableness of the defendant's expectation of privacy in the package must be considered to have been substantially reduced by his "own actions," *Walter v. United States*, 447 U.S. 649, 664, 100 S.Ct. 2395, 2405, 65 L.Ed.2d 410 (1980) (Blackmun, J., dissenting). *Cf. United States v. Miller*, 589 F.2d 1117, 1125–26 (1st Cir. 1978) [boat left unattended for twelve hours at unauthorized mooring justified little expectation of

---

**19.** The *Terry* balancing approach was also applied where a boarding passenger successfully passed through a metal screening device at an airport but his suspicious behavior had generated concern that a further search for dangerous items undetectable by these devices was necessary. *See United States v. Dalpiaz*, 494 F.2d 374 (6th Cir. 1974) [search of pockets revealed nonmetallic explosive device]. *But see State v. Salit*, Alaska, 613 P.2d 245, 252 n.20, 253 (1980) ["generally, the possibility of explosives or weapons undetectable by x-ray will not justify a warrantless search," except perhaps when a bomb threat is received] (dictum).

The Court must respectfully decline to adopt the view expressed by the majority in *State v. Salit, supra*, for the reasons advanced in the concurring opinion of Justice Matthews. *See State v. Salit*, 613 P.2d at 258–59 (Matthews, J., concurring). Under the circumstances of the present case the Court cannot accept the implicit suggestion that law enforcement officers are required to risk their own safety and that of other persons and property, until "unconventional weapons do become a problem and require different screening procedures...." *See* 613 P.2d at 252.

privacy in view of the limited privacy expectations of boatowners generally and the apparent abandonment of the boat].

Finally, it is highly significant that the primary purpose of the hand search was the desire to assure that the package was not dangerous, a legitimate, noncriminal-investigative purpose, *cf. Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) [upholding warrantless, noncriminal-investigative search for evidence of cause of fire immediately after its extinguishment]; *United States v. Miller*, 589 F.2d at 1126 [noncriminal-investigative purpose of search for evidence of drowning considered important factor in upholding search]; *United States v. Markland*, 635 F.2d 174, 176 (2d Cir. 1980) [police had duty to secure victim's property found at accident scene, and to look inside thermal package whose contents "might have been perishable, valuable, or dangerous"], as evidenced by the efforts of the airport security officer to obtain the assistance of the bombsquad and to assure that members of the general public were not within the vicinity of the site of the hand search. *Compare United States v. Kroll*, 481 F.2d 884, 887 (8th Cir. 1973). On the basis of these "specific articulable facts ... taken together with rational inferences from those facts," 392 U.S. at 21, 88 S.Ct. at 1879, the airport security officer reasonably believed that an exigency existed requiring an immediate warrantless search in the interests of public safety.

The Court must be sensitive to the prophylactic purposes of the exclusionary rule, yet sensible in its practical application. Judicial vigilance is required "in ferreting out bogus or unjustified claims of danger," 3 W. LaFave, *Search and Seizure*, § 10.6, at 358 (1978), in the context of searches for explosive materials and devices, due to the risk that the resultant dispensation from the warrant and probable cause requirements may invite pretextual assertions of danger as a convenient means of displacing fourth amendment safeguards. But the salutary concern that unreasonable governmental intrusions upon the privacy of the individual not be facilitated by sievelike exceptions to the exclusionary rule does not militate

against the fact-specific rationale of the present case. There need be little, if any, genuine concern that law enforcement officials, even if so minded, could successfully invent the specific, articulable facts upon which the warrantless hand search was predicated in the present case, as a pretext for future warrantless searches. The well-documented omission *by the defendant* of information necessary to enable the air carrier to contact the alleged consignor and the misrepresentation *by the defendant* as to the nature of the contents of an airfreight package presented *by the defendant* for shipment aboard a particular airline flight immediately prior to its scheduled departure must be considered impossible of fabrication; that is, unless our adversary system of criminal justice is itself less reliable than such a scenario necessarily presumes law enforcement to be.

### III

### MOTION TO SUPPRESS ORAL STATEMENTS

■ The defendant moves to suppress oral statements made following his arrest, relying on *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) [custodial interrogation]; *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) [exploitation of unnecessary delay in bringing defendant before a magistrate]; *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) [fruit of the poisonous tree]; *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) [statements obtained by force or coercion].

The statements were obtained during routine booking within 90 minutes of the arrest. There is no indication of any unnecessary delay, *cf. Mallory v. United States*, 354 U.S. 449, 455–56, 77 S.Ct. 1356, 1359–60, 1 L.Ed.2d 1479 (1957) [confession inadmissible when appearance unnecessarily delayed], or that extended questioning delayed the appearance before a magistrate, *cf. McNabb v. United States*, 318 U.S. 332, 341–45, 63 S.Ct. 608, 613–615, 87 L.Ed. 819

[confession made during lengthy questioning preceding appearance, held inadmissible].

The statements were not made in response to questioning "or its functional equivalent," that is, "words or actions on the part of the police officers that they *should have known* were reasonably likely to elicit an incriminating response.... " *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (emphasis in original). It does not even appear that the statements were made in response to background questions asked during routine booking, which have been held to be outside the scope of *Miranda, see United States v. Foskey,* 636 F.2d 517, 522 n.3 (D.C.Cir.1980). The statements and inquiries were spontaneously made while the officers were listing the items seized from Sullivan. There is no indication that anything was said by the officers during the booking, other than possibly an "offhand remark," *see United States v. Voice,* 627 F.2d 138, 144–45 (8th Cir. 1980), or a casual inquiry, *see United States v. Hackley,* 636 F.2d 493, 496–97 (D.C.Cir.1980), which could even arguably have had the effect of provoking these statements.

Since the statements were spontaneous and not the result of any interrogation, there is no need to determine whether the defendant waived his *Miranda* rights, nor is there any evidence whatever that the statements were involuntarily made as the result of threats or coercion.

Finally, the warrantless search of the package having been determined reasonable in the circumstances, the arrest and subsequent statements cannot be considered the products of an illegal search. *See Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963).

## IV

### CONCLUSION

On the basis of the foregoing findings of facts and conclusions of law the defendant's motions to suppress physical evidence and oral statements must be and hereby are DENIED.

It is so ORDERED.

## APPENDIX A

### DELTA AIR LINES, INC.

### STATIONS BULLETIN NO. 75–B44

December 24, 1975
### CARGO SECURITY SCREENING

As a logical extension of the security screening program in effect for air carriers, the FAA and the carriers have agreed on security measures for air cargo. These regulations apply to all forms of cargo (air freight, Delta Air Express, and DASH) and represent efforts to provide security with a minimum disruption of cargo movement.

Accordingly, in implementation of the FAA program, the following procedures will be effective as of January 1, 1976:

"*Security Screening of Air Cargo*—Air cargo shipments (including DASH and Delta Air Express) may be accepted from known shippers for dispatch on the first available or booked flight. The person delivering a shipment from a known shipper must be known to the employee accepting the shipment or must identify himself with a shipping document, personal and/or company identification (preferably with photograph), or a letter issued by the shipper.

"A known shipper is one who:

1. Is a regular shipper or one who periodically proffers goods for air shipment; or

2. Has established credit with Delta; or

3. Is recognized as a reputable business or individual.

"If air cargo is accepted from other than known shippers, the person delivering the cargo is required to show personal and/or company identification (preferably with photograph). If there is any suspicion or if the shipment is delivered by a third party (e.g., a taxi cab driver), the shipment must be inspected by x-ray or by hand, held for 24 hours prior to dispatch, or refused. Delta prefers not to hold or refuse shipments if at all possible.

"Handling and storage procedures must ensure that the shipment is safeguarded during loading and dispatch to prevent tampering with, or adding to cargo already accepted."

The provisions of these security regulations will have to be explained to shippers (particularly DASH customers) to avoid delays in movement or refusals. In this connection, the assistance of Marketing Representatives would be of considerable aid in publicizing the standards being enforced.

By copy of this Bulletin, Methods is requested to revise appropriate S.P.'s to include the procedures shown above.

/s/ C. A. Thompson
Assistant Vice President—Stations