STATE of Missouri, Plaintiff-Respondent,

v.

John Wesley JOHNSON,
Defendant-Appellant.

No. 35553.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Aug. 12, 1975.

Motion for Rehearing or Transfer
Denied Oct. 22, 1975.

In the late afternoon on September 14, 1970, Mr. Patrick R. Zangrilli, the manager of passenger service for American Airlines at Lambert International Airport, received a telephone call. The caller requested the sum of $100,000, "otherwise a bomb would be put on one of our airplanes." "It appeared or sounded as though it was a male Negro voice." The caller informed Zangrilli that fifty thousand dollars was to be put in a brown bag and left on Lindbergh Boulevard and I–70 at a specified place, and the other fifty thousand was to be delivered to a specified room at a motel across from the airport and was to be placed "under the mattress on the bed." Zangrilli was to "leave the room and leave the door ajar." If the instructions were not followed, "a bomb would be placed on one of our airplanes." Mr. Zangrilli immediately called the city and county police and the F.B.I. He also notified his supervisor at the ticket counter, Miss Marilyn Reed,[2] and alerted her to scrutinize every person checking in for any flight on American "for anything at all that might be suspicious."

Murry A. Marks, Clayton, William J. Shaw, Public Defender and Richard L. Rodemeyer, Asst. Public Defender, Clayton, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, Courtney Goodman, Pros. Atty., Clayton, Charles B. Blackmar, Special Asst. Atty. Gen., St. Louis, for plaintiff-respondent.

SIMEONE, Presiding Judge.

As a result of an airport search of a briefcase belonging to defendant, which revealed a controlled substance, to wit, heroin, the defendant-appellant, John Wesley Johnson, was charged, tried to the court without a jury, found guilty and sentenced to five years in the department of corrections. §§ 195.017, 195.020 and 195.200(2), RSMo Supp. 1973.[1] He appeals. For reasons hereinafter stated, we affirm.

At the time of the bomb threat, Officer Michael Carter, supervisor of the Bureau of Flight Operations of the St. Louis County Police, was working at the airport with Officer John Miederhoff, also of the county police, and Officer John Reeg of the airport police. Officer Carter talked with Mr. Zangrilli, who informed him of the telephone threat.[3] He also talked to Miss Reed and inquired of her whether she had seen or heard anything "that she felt suspicious."

Miss Reed, the supervisor of airport passenger service for American, told her ticket agents about the "extortion threat" after a meeting she and other supervisors had with

1. The defendant was charged with unlawful possession of heroin (a felony) and conspiracy to possess heroin (a misdemeanor). At the conclusion of the trial, the trial court sustained a motion for judgment of acquittal as to the conspiracy. Hence, this appeal involves only the conviction of the felony charge.

2. At the time of trial, Miss Reed had married; her married name became Mrs. Marilyn Hicks. For purposes of this appeal, we shall refer to her as Miss Reed.

3. Officer Carter said that Mr. Zangrilli had informed him that the voice "appeared to be that of a Negro male whose age he hesitated to speculate on, neither very old or very young."

Mr. Zangrilli. Miss Reed also watched "the transaction of the purchase" of a ticket at which the defendant-Johnson bought a ticket to Chicago from one of the ticket reservationists—Miss Jeraldine Hall. Mr. Johnson came to the ticket counter and asked for a one-way ticket to go to Chicago. Miss Hall inquired if he had reservations, and he replied, "No." She asked, "What flight do you want to go on?" And he replied he wanted a later flight that evening. During the sale of the ticket, Miss Hall inquired as to his name. "[H]e paused for a minute and seemed hesitant and seemed like he was making up a name and then he gave me a name, a last name which I asked for first, and then he gave me another name and it was hesitant, seemed rather strange because people don't usually hesitate to the [sic] names." The name he gave was "L. Jones." He had no luggage and paid for the ticket in cash. As he left, Miss Reed and Miss Hall "looked at each other."

Miss Reed followed Johnson down to the center concourse, lost him for a while and then saw him again at the gate, in the boarding area.

Miss Reed had informed Officer Carter that the only person she felt was acting in a suspicious manner that concerned her was a gentleman who had inquired about a ticket to Chicago who "had in his possession a black attaché case that he clutched rather possessively." Miss Reed accompanied the officers to the gate and pointed out the defendant, who was sitting in the passenger area near the gate where persons wait to board aircraft. Officer Carter approached the defendant and asked for identification. At about the same time, Officer Carter requested defendant to step out to the "ramp area" which he did, leaving the briefcase on the bench. In response to Officer Carter's request, the defendant produced an application for a Missouri driver's license, a social security card and his airline ticket. The application and social security card were in the name of John Wesley Johnson, and the ticket was in the name of "L. Jones."

Officer Carter inquired "why there was a discrepancy in the name on the ticket that he had purchased and the name on the I.D. that he showed me and he [Johnson] told me [Carter] that he had purchased the ticket with his brother-in-law's credit card." Of course, Miss Reed had indicated earlier that the ticket was purchased in cash.

While in the ramp area, Officer Carter, in the presence of Officer Miederhoff and Mr. Reeg, asked the defendant if "he had anything in the briefcase that he shouldn't have." And Johnson replied, "No." Then Officer Carter said, "Do you mind if we take a look at it?" Johnson again replied, "No." Officer Miederhoff then went back inside and obtained the case. Officer Carter opened it. Inside was found "a great deal of money"—$2562.00, a hypodermic needle, a silver spoon containing a white powdery substance, a syringe "like an eye dropper," and a whiskey bottle containing a red substance "that did not have the odor of alcohol at all." A tinfoil packet containing a white powdery substance and two brown bottles marked Dormin were found later.

Officer Carter did not advise Johnson that he had a right not to have the briefcase searched. No force or threats was used; no promises were made. Officer Carter then told Johnson he was under arrest, advised him of his rights and asked him if he understood. "He nodded that he did." Officer Carter contacted Officers Thomas Prokawski and Weldon Angelo of the Narcotics Bureau of St. Louis County Police, who came to the police room at the airport about 7:30 p. m. They, together with Officer Carter, went through the contents of the briefcase and initialed the case and the other items. The evidence was turned over to Officers Prokawski and Angelo. They left with the defendant, Johnson. Officer Carter stayed at the airport. Prokawski and Angelo took custody of Johnson, placed him in an unmarked police car and "gave him his Miranda rights as we drove to Clayton." There was no conversation between them in the police vehicle, although Johnson said he understood his rights.

When they arrived at headquarters, they met their superior officer, Detective Sergeant Norvell Benoist. Johnson came into the office accompanied by the two officers. Benoist asked if he had been advised of his rights, and the defendant indicated he had. There Johnson made a statement that he was going to Detroit to purchase some drugs and bring them back to the St. Louis area. He said that several persons had given him money to purchase drugs to bring back to St. Louis for distribution among those who had contributed. He was to purchase "three pounds of marijuana and ten ounces of combined cocaine and speed."

The material found in the briefcase was turned over by Officer Weldon Angelo to the chemist assigned to the County—Mr. Robert Roither. Mr. Roither, a criminalist employed by St. Louis County Police Department, testified that he ran standard tests on the material found in the briefcase. The white substance on the spoons was heroin; the substance in the tinfoil packet was heroin and the liquid substance in the whiskey bottle was methadone.

On October 16, 1970, the appellant was indicted for unlawfully having heroin in his possession. On February 17, 1971, an information in lieu of indictment was filed charging five previous felonies and possession of heroin. Motions to suppress were filed, and the trial eventually took place beginning on November 27, 1972. Prior to the actual trial, the trial court heard a "motion for rehearing" to suppress [4] the evidence of the alleged unlawful search and seizure and alleged confession and, after hearing the matter, overruled the motion for rehearing as well as defendant's oral motion to suppress the evidence and confession. The court found the statements were voluntary.

After the court overruled the motion to suppress, the defendant voluntarily waived his right to a jury trial, and agreed that the evidence produced on the previous day's hearing on the motion to suppress "can be stipulated to as though presented in the state's case in chief."

On December 15, 1972, the court found the defendant guilty as charged and on December 18, 1972 assessed punishment at five years. On June 28, 1973, after the motion for new trial was overruled and after allocution was granted, the defendant was sentenced to five years in the department of corrections. The defendant duly appealed.

On this appeal, the appellant contends that "the court erred by [sic] overruling the appellant's motion to suppress the evidence." We are not given the benefit of counsel's thoughts as to "wherein and why" the court erred, but we glean from the argument portion of the brief that appellant contends the court erred because (1) the defendant did not voluntarily consent to the search of the briefcase, and (2) there was no probable cause by Officer Carter to search the briefcase "without a basis for suspicion" under the facts recited above. Appellant contends he did not consent to the search of the briefcase, and that consent involves a waiver—voluntarily and intelligently. He also contends that he was not advised of any right to refuse the search, and hence the search of the briefcase violated his rights. He also contends that there was no basis for a search and that he was searched "without a basis for suspicion and therefore illegally." He contends the factors did not establish sufficient "probable cause for a police officer who did not even observe appellant to stop and ask to search appellant." Hence, he contends his Fourth Amendment rights were violated. He contends he was stopped and searched because of a "profile," and "[a]ny profile method which incorporates impermissible factors or permits capricious delection [selection?] of passengers to be searched is void."

4. The "motion for rehearing" alleged that defendant had been unlawfully arrested, i.

e., without a warrant and without probable cause.

We reject both contentions of the appellant and hold that the trial court did not err in (1) overruling the motion to suppress, (2) finding that the search of the briefcase was valid, and (3) finding the defendant guilty of the offense charged. We believe that the search of the briefcase was proper under the circumstances and that the investigating officers had reasonable grounds to take the action they did. We come to this conclusion regardless of whether there was a consent to search and regardless of whether there were sufficient facts and circumstances to warrant the arrest of the defendant based upon the traditional "probable cause" test. The search, under these circumstances, was legitimate and can be upheld upon the well-developed principles of "airport searches."

This is a court tried case. In such case, we review the cause both upon the law and the evidence and reach our own independent conclusions from a consideration of all the evidence, giving due deference to the trial court to judge the credibility of the witnesses. We are not to set aside the findings unless clearly erroneous. *State v. Rush*, 497 S.W.2d 213, 215 (Mo.App.1973); Rule 28.18.

We deal here with an "airport search" and the peculiar problems connected therewith. The real issue on this appeal, as appellant recognizes in his brief, is the validity of a search and seizure at an airport which resulted in the conviction of the appellant. Important and heretofore unresolved questions are involved. Resolution of this issue requires us to perform the "difficult and sensitive task" of balancing individual rights against the public interest in effective security at airport terminals, and in effective security of airlines and air travelers.

In today's society, airports and commercial aviation face new phenomena with potential "catastrophic consequences." *United States v. Cyzewski*, 484 F.2d 509, 511 (5th Cir. 1973). The incidences of bomb threats, air piracy, extortion and other schemes endanger commercial aviation, its personnel and property and the traveling public. To offset these dangers, security measures at an airport are necessary and essential. But necessity alone, however, does not authorize unlimited and unreasonable measures. For a search and seizure without a warrant to be valid, a cautious balance must be struck between the competing interests of personal privacy and the interests of law enforcement in protecting security at an airport.

The airport is a "critical zone" where special considerations apply. *United States v. Moreno*, 475 F.2d 44, 51 (5th Cir. 1973). Numerous decisions in recent years have upheld airport searches where there are "specific and articulable facts" which, when taken together with rational inferences from those facts, reasonably warrant an intrusion into individual privacy. These decisions [5] have upheld airport searches on the

---

5. *United States v. Moreno*, supra—airport passenger in airport lounge area enroute to boarding gate appeared nervous, went from line to line, had bulge in pocket and gave inconsistent answers when officer asked for identification—search disclosing heroin upheld; *United States v. Cyzewski*, supra—false name on ticket—search of checked luggage containing marijuana upheld; Cf. *United States v. Palazzo*, 488 F.2d 942 (5th Cir. 1974); *United States v. Skipwith*, 482 F.2d 1272 (5th Cir. 1973)—search of boarding passenger who gave false name on ticket may be based on mere or unsupported suspicion, where defendant had no identification, met "profile" and name on ticket was false—search revealing cocaine upheld; *United States v. Bell*, 464 F.2d 667 (2nd Cir. 1972)—magnetometer's use found to be constitutionally sound—defendant matched "profile," lacked identification and gave false answers—search disclosing heroin upheld; *United States v. Slocum*, 464 F.2d 1180 (3rd Cir. 1972)—magnetometer upheld—defendant unable to produce identification, search of handluggage containing cocaine upheld; *United States v. Legato*, 480 F.2d 408 (5th Cir. 1973)—bomb threat, untruthful replies to investigation and consent to search—search disclosing heroin upheld; *United States v. Lindsey*, 451 F.2d 701 (3rd Cir. 1971)—nervous and conflicting identification, bulge in pocket—search disclosing heroin upheld; *United States v. Fern*, 484

basis of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[6] In balancing Fourth Amendment interests against the practical requirements of effective law enforcement, the Supreme Court measured the constitutionality of the officer's conduct by the standard: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry v. Ohio*, supra, 392 U.S. at 21–22, 88 S.Ct. at 1880. In justifying a particular intrusion, the officer must be able to point to "specific and articulable facts" which, taken together with rational inferences from those facts, reasonably warrant an intrusion. *Terry v. Ohio*, supra, 392 U.S. at 21, 88 S.Ct. 1868. In appropriate circumstances, an officer may approach a person "even though there is no probable cause to make an arrest." *Terry*, supra, 392 U.S. at 22, 88 S.Ct. at 1880.[7]

■ Although the personal safety of the officer was involved in *Terry*, of equal importance to airport security is the central purpose of protecting the airlines, their personnel and property and the multitude of air passengers who utilize our airways. Hence, the numerous decisions have held that an airport search may be made when there are "specific and articulable" facts shown which warrant an intrusion of privacy and a search and seizure is made. In applying the special considerations to airport searches, an officer is not limited to a "pat down" search when there is a proper basis for further investigation. *United States v. Moreno*, supra, 475 F.2d at 51. Rather, the search may be of sufficient scope so as to reveal objects or instrumentalities. The officer has the right to search not primarily for his own protection but rather for the protection of a "distinct and uniquely threatened class"—the carriers, their crews, airport personnel and the traveling public.

■ The courts which have addressed the problem of airport searches have therefore consistently held that airport security measures constitutionally justify a limited and relatively insignificant intrusion of privacy balanced against the need to protect aircraft, the airport and the passengers. *United States v. Cyzewski*, supra, 484 F.2d at 512. The search may continue until the law enforcement officer satisfies himself that no harm would come from the person whom he has reason to believe may cause harm. To be effective, security efforts may focus not only on the aircraft or tangible items but on a person, his demeanor and his possessions during the course of his airport presence. *United States v. Cyzewski*, supra, 484 F.2d at 513.[8]

---

F.2d 666 (7th Cir. 1973)—boarding passenger pretending to read newspaper, changed seats leaving carryall, clutched white bag, one-way ticket, claimed he lived in San Francisco but didn't know address, indicated traveling from New York to San Francisco, but ticket showed Chicago—search disclosing heroin upheld; *United States v. Dalpiaz*, 494 F.2d 374 (6th Cir. 1974); *United States v. Riggs*, 474 F.2d 699 (2d Cir. 1973)—defendant bought three one-way tickets in cash which she produced from paper bag in name of "P. Griggs"—search disclosing narcotics upheld; *United States v. Epperson*, 454 F.2d 769 (4th Cir. 1972)—weapon.

**6.** See also *United States v. Moreno*, supra; *United States v. Cyzewski*, supra; *United States v. Palazzo*, supra, 488 F.2d at 945; *United States v. Legato*, supra, 480 F.2d at 411; *United States v. Bell*, supra.

**7.** In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), it was stated:

" '[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' 392 U.S. at 22, 88 S.Ct. at 1880 [20 L.Ed.2d at 906]. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape."

**8.** The courts in resolving the airport security search have made it clear that an investigation need not be curtailed simply because the passenger decides not to take a particular flight. The right to leave argument followed in *United States v. Meulener*, 351

■ Tested within these constitutional principles, a number of "specific and articulable" facts here clearly provided an adequate basis for Officer Carter's investigation and a search of the defendant's briefcase. A bomb threat had been received; appellant purchased a one-way ticket to Chicago in the name of "L. Jones"; he paid in cash, but when confronted he indicated that he purchased the ticket with his brother-in-law's credit card; his identification was in the name of John Wesley Johnson; when he purchased the ticket he hesitated as to his name. These and other factors were sufficient for Officer Carter to investigate and search. While these factors may also be sufficient to constitute probable cause to arrest,[9] the validity of the search need not rest upon that traditional ground. The factors were more than ample for Officer Carter to conduct a search of the defendant's briefcase and, upon finding the items he did, to arrest the defendant for possession of narcotics.

■ We do not believe that consent to search is an essential factor in this proceeding. Having sufficient cause to investigate and search the briefcase, the consent of the defendant was immaterial. However, we believe that under the principles of *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and *State v. Rush*, supra, the trial court could have properly found that the defendant consented to the search. At the time, the conversation was casual; the officers did not overemphasize authority; there was no fraud or misleading on the part of the officers; and the search was the product of an essentially free and unconstrained choice.[10] The authorities relied upon by the appellant—*State v. Witherspoon*, 460 S.W.2d 281 (Mo.

1970), and *State v. Young*, 425 S.W.2d 177 (Mo.1968)—are distinguishable.

Appellant relies on *United States v. Kroll*, 481 F.2d 884 (8th Cir. 1973). The court there held that although the security agents acted legally in searching the carry-on luggage of a passenger who fit the "profile" and activated the magnetometer, the agents exceeded the bounds of reasonableness by opening a small envelope in the file section. That is not the situation here.

We have read the entire transcript, the briefs and authorities relied upon by the appellant, and we are convinced that the search conducted by Officer Carter at the airport under these circumstances was legitimate and was not unreasonable or violative of the Constitution of the United States or of Missouri. Ample reasons existed for this airport search—and it was justified—to protect the property of the commercial airlines and to safeguard the lives of the public who utilize air transportation. We are convinced the judgment of conviction should be affirmed.

The judgment is affirmed.

McMILLIAN and GUNN, JJ., concur.

---

F.Supp. 1284 (C.D.Cal.1972), and relied upon by appellant in his brief has been expressly rejected. See *United States v. Cyzewski*, supra, 484 F.2d at 513, n. 4.

**9.** See *State v. Novak*, 428 S.W.2d 585 (Mo. 1968); *State v. Pruitt*, 479 S.W.2d 785, 788 (Mo. banc 1972); *State v. Seymour*, 438 S.W.2d 161, 163 (Mo.1969).

**10.** Whether in a particular case a consent is in fact voluntary or was in submission to an express or implied assertion of authority is a question of fact to be determined in light of all the circumstances. *Schneckloth v. Bustamonte*, supra, 412 U.S. at 248–249, 93 S.Ct. at 2059, 36 L.Ed.2d at 875.