The People of the State of New York, Appellant, v Russell Smith, Respondent.

Second Department, February 22, 1988

### APPEARANCES OF COUNSEL

*John J. Santucci, District Attorney (Ellen Abbott* of counsel), for appellant.

*Kenneth E. Bruce* for respondent.

### OPINION OF THE COURT

Sullivan, J.

On this appeal we are called upon to determine if the actions of a Port Authority police officer in conducting a warrantless search and seizure of a package scheduled to be

sent as airfreight was justified under the emergency exception. It should be noted that this was the sole basis advanced by the District Attorney at the hearing and on this appeal. The hearing court determined that the actions of the police officer were not within this limited exception and suppressed the contents of the package and all that flowed from it. Upon the record before us, we agree.

The limited privilege given to law enforcement agents to investigate emergencies threatening life or property without a search warrant is subject to judicial scrutiny to determine if the police action is reasonable. The burden of justifying a warrantless search under the emergency doctrine rests on the People.

In *People v Mitchell* (39 NY2d 173, 177-178, *cert denied* 426 US 953), the basic elements of the emergency doctrine were set forth as follows:

"(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

"(2) The search must not be primarily motivated by intent to arrest and seize evidence.

"(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched".

In this case, a small package was delivered by the defendant to the airfreight desk of Eastern Airlines at La Guardia Airport. The airway bill of lading indicated that the package contained surgical instruments. At that time the baggage service agent at the airfreight desk did not consider it suspicious. After a period of time, as she took the package to be put on the flight, she shook it and heard nothing. Earlier that day the agent was advised that the Federal Aviation Administration had issued a terrorist alert and that she should check any package that did not come from a regular shipper. At that point she became suspicious of the package and advised her supervisor. Following her supervisor's direction, the baggage service agent put the package through an X-ray machine, but saw nothing. She informed her supervisor who conferred with the shift manager who in turn called for a Port Authority police officer to inspect the package.

When the officer arrived at the office, he spoke to the baggage service agent and again X-rayed the package. He observed two opaque cylinders that could have been glass or

plastic, but nothing metallic. He saw nothing that appeared to be a detonator. If he had seen anything that appeared to be a detonating device, the officer would have notified the New York City Police Department Bomb Squad pursuant to an established procedure. The officer, however, merely called his supervisor who advised him to open the package. The officer then opened the box in the back room in the presence of Eastern Airlines employees. This occurred about 1½ hours after the package was received by the baggage service agent. Inside he found two candles wrapped in newspaper, and between them a plastic bag containing a white powder later found to be cocaine.

It is the first prong of the *Mitchell* test that is at issue in this appeal. This in turn consists of two parts: the police must have reasonable grounds to believe that there is (1) an emergency at hand, and (2) an immediate need for police assistance for the protection of life or property. The People failed to establish either of these factors.

The officer acted initially upon the suspicions of the Eastern Airlines baggage service agent who had received a package from a nonregular courier that was supposed to contain surgical instruments, but did not appear to contain such instruments. She suspected that it might contain explosives. The record before us does not suggest any further basis for this suspicion. The so-called terrorist alert, upon which our dissenting colleagues place great reliance, was an oral, non-specific, warning concerning packages sent by nonregular companies or couriers. No effort was made by Eastern Airlines to verify either the consignor or the consignee. There was no evidence adduced at the hearing that Eastern Airlines had any established internal procedure for the treatment of suspicious packages or that the employees had even the most rudimentary knowledge of explosives or explosive devices. In short, no reasonable basis was established in the record for the suspicion of the Eastern Airlines personnel that this package contained explosives, which it did not, rather than contraband, which it did.

X-ray examination did not reveal any detonator, wiring or timing device, or blasting cap. It appears that there were, in fact, two separate X-ray examinations of this package: the first by Eastern Airlines personnel and a second by the police officer. Neither examination revealed anything of a suspicious nature. The dissenters argue that the absence of an identifiable object would render the package a danger that required

immediate police intervention. Such a view would stand the reasonableness standard of the Fourth Amendment on its head. Every package that did not reveal an ascertainable object upon X-ray examination would, under the dissenters' view, be subject to a warrantless search by law enforcement officers under the emergency doctrine.* It is significant to note that, according to the officer's own testimony, if there had been a serious threat that the package had been an explosive device, he would have been required, by an established procedure, to call the bomb squad. Most telling is the testimony of the officer that he informed his supervisor that he could not identify the items inside the box and that he had to open it to check it out further.

This does not establish probable cause to believe that there is an emergency. Here, there were no articulable facts leading to the conclusion that there was a danger to life or property. All that the officer knew was that the package contained an unknown substance and there was no apparent means or device for detonating or igniting it. This is in sharp contrast to the facts in *People v Calhoun* (49 NY2d 398) where there had been a fire of unknown origin that required emergency action to extinguish it. Entry onto the property four hours later was justified under the emergency exception to determine the cause of the fire and to ascertain if the obvious emergency still continued.

Contrary to the view taken by the dissenters, the testimony at the hearing indicated that the police officer did not comply with established procedures which provided that "[s]hould a suspicious object be found, it will be examined by the New York City Police Department's Bomb Squad personnel".

The court at the hearing asked the Port Authority police officer under what circumstances he would call the bomb squad to investigate a suspicious package. His response was, "When we have established that there's a serious threat of a potential device". It is obvious from the officer's failure to call the bomb squad in this instance that he did not consider that this package posed a serious threat.

The case of *United States v Sullivan* (711 F2d 1) is not factually analogous to the case at bar in several key elements.

---

* We are not concerned herein with the common-law right of Eastern Airlines to have its employees inspect packages *(see,* United States v Edwards, 602 F2d 458), which would not have implicated Fourth Amendment considerations.

In *Sullivan,* the testimony before the hearing court *(United States v Sullivan,* 544 F Supp 701) established: (1) that the Delta Airlines airfreight supervisor had made an independent determination to open the package, (2) that Lieutenant Seabrease, who was specifically trained in the field, articulated reasons for his belief that the package contained an explosive, (3) that the local bomb squad was not available and there was no suitable bomb storage or transportation equipment, and (4) that Lieutenant Seabrease acted with the express permission and assistance of the Delta Airlines airfreight supervisor. None of these factors, which weighed significantly in the decision in *Sullivan,* are to be found in the record in this case. In fact, the police officer in this case was quite explicit in stating that he did not open the package at the request of Eastern Airlines personnel, but at the directions of his sergeant. Thus, unlike Lieutenant Seabrease in *Sullivan,* the officer was not simply rendering technical assistance to the civilian employees.

Furthermore, the Federal courts in the *Sullivan* decisions *(supra)* placed emphasis on the fact that the airline employees had made independent decisions to open the package and that the police officer acted with them and simply rendered technical assistance. We do not find those circumstances in the record before us. On direct examination of the Port Authority police officer, the following testimony was elicited:

"A. At this point I had called up my supervisor, Sergeant Matura, and informed him what I had seen on the screen and whether I should go forth and open the package since there was no obvious metallic object or detonator visible that it could have been just an explosive device being shipped without an exploder attached to it.

"Q. What response did he give you?

"A. He told me to open up the package and get back to him when I found out what was inside of it.

"Q. What did you do then?

"A. I opened up the package in the presence of [Eastern Airlines employees]".

Based upon this testimony, we cannot agree with our dissenting colleagues' conclusion that the officer opened the package as the agent of Eastern Airlines.

Nor is the second factor of the first prong of *Mitchell* satisfied in this case. In the first instance, the officer admitted in his testimony that he did not believe that there was any

imminent danger posed by the package. This is evidenced by the fact that the officer opened the package without the assistance of the bomb squad and while other airline personnel were present.

Since the action of the police in conducting a warrantless search and seizure of this package does not fall within the emergency doctrine as set forth in *People v Mitchell* (39 NY2d 173, *supra),* the results of that search must be suppressed, and the defendant's arrest was illegal. Therefore, the statements made by him following this illegal arrest must be suppressed *(see, Dunaway v New York,* 442 US 200) and the subsequent identification of the defendant in a lineup must also be suppressed *(see, People v Dodt,* 61 NY2d 408).

EIBER, J. (dissenting). The central issue on appeal is whether it was reasonable for a Port Authority police officer to conduct a warrantless search of a package, which was left with airline personnel to be shipped, and which was suspected of containing an explosive device. We would answer this question in the affirmative.

On June 29, 1985, an individual, later identified as the defendant, dropped off a package at La Guardia Airport's "Sprint" shipping counter. Dolores Birch, the baggage service agent, was informed by the defendant that the package contained surgical instruments. A terrorist alert had previously been issued, warning airline personnel to be wary of packages delivered by individuals, like the defendant, who were not customary couriers. Ms. Birch, prompted by the alert, shook the package which had been submitted by the defendant and, consequently, became suspicious when she heard no sound emanating from it. With the aid of her supervisor, she X-rayed the package and found that it contained no metal.

The airline employees thereupon summoned Port Authority Police Officer William McCauley to the "Sprint" counter and immediately apprised him of their suspicions with respect to the package. The officer proceeded to X-ray the package and similarly found no indication that it contained any metal. He was, however, able to discern, by means of the X-ray inspection, that the package contained two opaque cylindrical objects. McCauley further testified, at the suppression hearing, that although he was not able, at this juncture, to conclusively identify the contents of the package, he nevertheless feared that it might contain some form of plastic explosive. Indeed, he specifically stated that while "there was no obvious metal-

lic object or detonator visible", the package "could have been just an explosive device being shipped without an exploder attached to it".

Because the officer suspected, on the basis of his experience and training in the detection of explosive devices by X ray, that this package posed a potential danger to the public, and pursuant to standard operating procedure which imposed a duty upon Port Authority police to "check * * * out" suspicious packages in order to ascertain whether explosive devices were present, McCauley eventually opened the subject package. Contrary to the representations of the majority, however, McCauley explicitly testified that he opened the package at the behest of the airline employees. In fact, this testimony was corroborated by Dolores Birch, who testified that her shift manager stated to McCauley: "I want you to open this package". McCauley, after consulting with his supervisor, complied with their request. Inside this package were two candles wrapped in newspaper as well as tissue paper enveloping a transparent plastic bag which contained a white powder. This substance later proved to be cocaine.

The following day, the defendant reappeared at the "Sprint" counter to retrieve the subject package. A detective was immediately summoned and the defendant was asked to accompany him to police headquarters. According to the testimony of this detective, the defendant then "blurted out" that he had delivered the package to the baggage service agent on the preceding day. The defendant was consequently arrested, advised of his *Miranda* rights and subsequently identified by Dolores Birch during a lineup procedure which was conducted at the precinct.

In response to the defendant's motion to suppress the physical evidence seized by the Port Authority police, Criminal Term concluded that because Officer McCauley's initial examination of the package, by means of an X-ray inspection, failed to conclusively reveal the presence of an explosive device and because the officer admitted, during the hearing, that the contents of the package, in his view, "did not present an imminent danger", it was, therefore, improper for the police to have opened the package without first obtaining a search warrant. We disagree with this conclusion.

In *People v Mitchell* (39 NY2d 173, *cert denied* 426 US 953), the Court of Appeals delineated the criteria necessary for the invocation of the "emergency" exception to the warrant re-

quirement. The court indicated that a warrantless search may be permissible if there are reasonable grounds to believe that there is an emergency at hand, if the search is primarily motivated by the desire to prevent the harm threatened and if some reasonable basis, approximating probable cause, exists to associate the emergency with the area to be searched.

At the suppression hearing, Officer McCauley testified that he opened the subject package based on his suspicions that the package contained an explosive device. He further indicated that although he did not "feel that there was any danger imminent", the package was, nevertheless, opened in consideration of "the potentiality of a major catastrophe" in the event the materials contained in the package were to explode. Indeed, he stated: "The only suspicion I had was that [the package] might be a possible danger to the public". This testimony, coupled with the fact that a terrorist alert had been issued, that the delivery of the package by the defendant matched the profile of this alert as well as the fact that the package, contrary to the defendant's representations, did not appear to contain any surgical instruments but, instead, seemingly contained glass or plastic opaque cylindrical objects, provides ample support for the conclusion that the search was clearly and primarily motivated by the desire to obviate or minimize the danger posed by a potentially "property-destructive or life-threatening" explosive device (see, People v Calhoun, 49 NY2d 398, 404).

We are also persuaded, by virtue of the foregoing facts, that Officer McCauley had valid and articulable reasons to justify the belief that exigent circumstances existed and that prompt action on his part, to wit, a physical inspection of the package, was necessary to abate the potential danger. The fact that the officer did not immediately notify the bomb squad does not undermine the propriety of his actions in light of the officer's explicit testimony regarding his obligation to initially discern, to the extent practicable, whether explosive materials had been submitted for shipment, before alerting the bomb squad "which would [also] entail an evacuation of the terminal building and surrounding areas".

Moreover, contrary to the conclusions of the hearing court, we do not believe that suppression of the evidence is warranted merely because the officer had expressed a belief that the package would not explode imminently. When dealing with explosives and other forms of incendiary devices, a search conducted in the aftermath of an X-ray inspection may

be permissible if necessary to ascertain the existence of a "lurk[ing]" albeit nonimminent danger *(see, People v Calhoun, supra,* at 404). Indeed, it has been noted that "[a] reasonable belief that explosives may be present" is sufficient, in and of itself, "to justify an immediate warrantless search" in view of the fact that "the asserted exigency results from the need to discover and render harmless a suspected explosive device, rather than to secure evidence of a crime" *(see, United States v Sullivan,* 544 F Supp 701, 716-717, *affd* 711 F2d 1).

The strictures of the Fourth Amendment are intended to protect citizens from unwarranted and unreasonable intrusions by agents of government. In order to assess whether the actions of the police officer are reasonable, the governmental interest in conducting a warrantless search must be balanced against the privacy interests of the defendant and the invasion which occurs as a result of the search. Courts which have addressed issues involving airport security measures have consistently adhered to the view that they are justified by the public's paramount concern for air safety and that a limited and a relatively insignificant intrusion of privacy is "minimal compared to the monumental governmental interest involved" *(Shapiro v State,* 390 So 2d 344, 349 [Fla], *cert denied* 450 US 982; *see also, United States v Skipwith,* 482 F2d 1272; *United States v Cyzewski,* 484 F2d 509, *cert dismissed* 415 US 902; *United States v Edwards,* 498 F2d 496; *United States v Bell,* 464 F2d 667, *cert denied* 409 US 991). Accordingly, it has been noted that an officer has the right to search "not primarily for his own protection but rather for the protection of a 'distinct and uniquely threatened class'—the carriers, their crews, airport personnel and the traveling public" *(see, State v Johnson,* 529 SW2d 658, 663 [Mo]). Thus, a search may be of sufficient scope so as to reveal objects or instrumentalities which may pose a danger to the public. Moreover, the search "may continue until the law enforcement official satisfies himself" that there is no immediate danger to air commerce *(United States v Cyzewski, supra,* at 513; *see also, State v Johnson, supra).*

Viewed in this context, we conclude that where, as here, the potential danger to the public is evident and the governmental interest so substantial, a search of the contents of a package, prompted by the reasonable belief that explosives may be present, does not constitute an infringement upon a defendant's constitutional rights *(see, People v Kuhn,* 33 NY2d 203; *People v Brown,* 113 AD2d 893; *United States v Smith,*

643 F2d 942, *cert denied* 454 US 875). In this case, the limited invasion of the defendant's rights "was more than warranted by the nature of the harm sought to be prevented—a possible bomb explosion on an aircraft" *(see, People v Fritschler,* 81 Misc 2d 106, 111). Furthermore, any expectation of privacy the defendant might otherwise have asserted was necessarily diminished by the fact that he willingly surrendered a package to a common carrier which bears the responsibility for monitoring what is shipped on its conveyances *(see, People v Price,* 54 NY2d 557, 563; *United States v Edwards,* 602 F2d 458).

In light of the fact that common carriers do possess the right to inspect packages under circumstances indicating that the contents may be of a suspicious or possibly dangerous nature, an ancillary question arises as to whether the consent of the airline employees validated the warrantless search by the police officer. It is clear from the record that the decision by the airline employees to enlist the services of a Port Authority police officer was predicated on the belief that the package submitted by the defendant might have contained explosive materials. Indeed, according to the testimony adduced at the hearing, Officer McCauley had duly complied with established procedure when he opened the package at the behest of these employees, who had "expressed fear" at the prospect of opening the package themselves. In *United States v Sullivan (supra),* a case factually analogous to the present matter, the defendant submitted a package to the airfreight counter of Delta Airlines at an airport terminal located in the State of Maine. The defendant had specified in the airway bill of lading that the package contained watches. The shipping clerk, for reasons similar to those proffered at bar, doubted the veracity of the information supplied by the defendant and, after consulting with his supervisor, summoned the airport police. The responding officer, at the request of the airline employees, proceeded to X-ray the package and ultimately determined that it did not contain watch parts. This officer later testified that he suspected that the package contained "a plastic explosive and either a nonmetallic detonation device or a metallic detonation device so small as to be undetectable by the available x-ray and Geiger equipment" *(United States v Sullivan,* 544 F Supp 701, 705, *supra).* Because the bomb squad was unavailable, the officer "[w]ith the permission and assistance" of an airline employee opened the package himself *(United States v Sullivan,* 544 F Supp 701,

705, *supra).* Inside the package was a white powder. Chemical analysis of this powder revealed that the substance was cocaine. In affirming the denial by the United States District Court of the District of Maine of the defendant's motion to suppress, the Court of Appeals for the First Circuit held that "Delta Airlines had an independent right, in light of the circumstances, to conduct the x-ray scan * * * and that the technical assistance of [the officer] was enlisted directly and exclusively in aid of this legitimate, safety-related, private airline purpose" *(United States v Sullivan,* 711 F2d 1, 2, *supra).* With respect to the propriety of the officer's actions in opening the subject package, the Court of Appeals essentially agreed with the District Court's conclusion that: "The actions of the defendant assumed the further risk that the air carrier might require precautionary police assistance in searching a package reasonably suspected by the air carrier to contain explosives. Where the circumstances warrant an airfreight inspection for suspected dangerous materials, an air carrier need not jeopardize its own or other persons and property by foregoing the technical assistance reasonably required in the circumstances merely because it is provided by government" *(see, United States v Sullivan,* 544 F Supp 702, 715, *supra).*

As in the *Sullivan* case *(supra),* the airline employees at bar consented to police participation in order to ensure "prior to shipping or storing the package, that the contents posed no danger to persons or property in the vicinity" *(United States v Sullivan, supra,* 544 F Supp, at 716, n 15). Moreover, once Officer McCauley had been "made aware of the suspicious circumstances * * * it was entirely reasonable for [him] to believe that the airfreight supervisor was authorized to permit him to render technical assistance in opening the package" *(United States v Sullivan, supra,* 544 F Supp, at 716, n 16; *see also, United States v Buettner-Janusch,* 646 F2d 759, *cert denied* 454 US 830).

In addition to the foregoing, it is equally significant that the court in *Sullivan (supra)* declared that the actions of the airline personnel and security officer comported with their genuine suspicions that the package might contain explosives and that these suspicions were not negated by the fact that the package, as in the instant case, was opened in the presence of two airline employees. We find the rationale employed in *Sullivan* to be persuasive and similarly conclude that the specific, articulable facts upon which the warrantless search was premised coupled with the inability to rule out the

presence of explosives "amply justified the air carrier's enlistment of the * * * assistance proffered by the * * * officer in conducting an immediate hand search" *(United States v Sullivan, supra,* 544 F Supp, at 718).

In sum, since the air carrier representatives consented to the search and since the officer reasonably believed that an explosive device may have been present in the package, the warrantless search in the interests of public safety should have been deemed proper. Accordingly, the evidence retrieved pursuant to this search should not have been suppressed.

MOLLEN, P. J., and SPATT, J., concur with SULLIVAN, J.; EIBER, J., dissents and votes to reverse the order appealed from and deny those branches of the defendant's omnibus motion which were to suppress physical evidence, his statements to law enforcement authorities, and a lineup identification of him, with an opinion in which LAWRENCE, J., concurs.

Ordered that the order is affirmed.